Richard R. Patch (State Bar # 088049)
J. Timothy Nardell (State Bar # 184444)
COBLENTZ, PATCH, DUFFY & BASS, LLP
One Ferry Building, Suite 200
San Francisco, California 94111
Telephone: (415) 391-4800
Facsimile: (415) 989-1663

Annamarie A. Daley (*pro hac vice*)
Emmett McMahon (*pro hac vice*)
Stephen P. Safranski (*pro hac vice*)
ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, Minnesota 55402
Telephone: (612) 349-8500
Facsimile: (612) 349-4181

Attorneys for Defendants COXCOM, INC. and
HOSPITALITY NETWORK, INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

|  |  |
|---|---|
| IN RE ACACIA MEDIA TECHNOLOGIES CORPORATION | Case No.  C05-01114-JW (HRL) <br><br> **DECLARATION OF ANNAMARIE A. DALEY IN SUPPORT OF DEFENDANTS' RESPONSE TO PLAINTIFF ACACIA MEDIA TECHNOLOGIES CORPORATION'S OBJECTIONS TO THE ORDER APPOINTING RAINER SCHULZ AS A TECHNICAL CONSULTANT** <br><br> **DATE:** N/A <br> **TIME:** N/A <br> **CTRM:**  Hon. Howard R. Lloyd |

I, Annamarie A. Daley, hereby declare as follows:

1.     I am a member of the law firm of Robins, Kaplan, Miller & Ciresi L.L.P., counsel of record for defendants Cox Communications, Inc., and Hospitality Network, Inc., in this case. I have personal knowledge of the facts state herein and, if called as a witness, I could and would testify competently thereto.

2.     Attached hereto as Exhibit 1 is a true and correct copy of the Request by Plaintiff Acacia for Limited Amendment to the Proposed Order Appointing Special Master, dated March 15, 2004.

3.     Attached hereto as Exhibit 2 is a true and correct copy of the Court's *Markman* Order, dated July 12, 2004.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 12th day of July, 2005, at Minneapolis, Minnesota.

_/s/ Annamarie Daley_
Annamarie A. Daley

**PROOF OF SERVICE BY U.S. MAIL**

I am a citizen of the United States and employed in Hennepin County, Minnesota. I am over the age of eighteen years and not a party to the within-entitled action. My business address is 2800 LaSalle Plaza, 800 LaSalle Avenue, Minneapolis, Minnesota 55402-2015. I am readily familiar with this firm's practice for collection and processing of correspondence for mailing with the United States Postal Service. On July 12, 2005, I placed with this firm at the above address for deposit with the United States Postal Service a true and correct copy of the within document(s):

> **DEFENDANTS' RESPONSE TO ACACIA MEDIA TECHNOLOGIES CORPORATION'S OBJECTIONS TO THE ORDER APPOINTING RAINER SCHULZ AS A TECHNICAL CONSULTANT;**
>
> **DECLARATION OF ANNAMARIE A. DALEY IN SUPPORT OF DEFENDANTS' RESPONSE TO PLAINTIFF ACACIA MEDIA TECHNOLOGIES CORPORATION'S OBJECTIONS TO THE ORDER APPOINTING RAINER SCHULZ AS A TECHNICAL CONSULTANT; and**
>
> **PROOF OF SERVICE**

in a sealed envelope, postage fully paid, addressed as follows as set forth on the attached Service List.

Following ordinary business practices, the envelope was sealed and placed for collection and mailing on this date, and would, in the ordinary course of business, be deposited with the United States Postal Service on this date.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on July 12, 2005, at Minneapolis, Minnesota.

/s/ Annamarie Daley
Annamarie A. Daley

# Exhibit 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| ACACIA MEDIA TECHNOLOGIES CORPORATION, | ) | **Consolidated Cases:** |
|---|---|---|
| | ) | SA CV 02-1040-JW (MLGx); |
| | ) | SA CV 02-1048-JW (MLGx); |
| | ) | SA CV 02-1063-JW (MLGx); |
| Plaintiff, | ) | SA CV 02-1165-JW (MLGx); |
| | ) | SA CV 03-0217-JW (MLGx); |
| | ) | SA CV 03-0218-JW (MLGx); |
| vs. | ) | SA CV 03-0219-JW (MLGx); |
| | ) | SA CV 03-0259-JW (MLGx); |
| NEW DESTINY INTERNET GROUP, | ) | SA CV 03-0271-JW (MLGx); & |
| | ) | SA CV 03-0308-JW (MLGx) |
| | ) | |
| | ) | **Related Cases:** |
| | ) | |
| Defendant(s). | ) | SA CV 03-1610-JW (MLGx); |
| | ) | SA CV 03-1800-JW (MLGx); |
| | ) | SA CV 03-1801-JW (MLGx); |
| | ) | SA CV 03-1802-JW (MLGx); |
| | ) | SA CV 03-1803-JW (MLGx); |
| | ) | SA CV 03-1804-JW (MLGx); |
| AND ALL RELATED AND/OR | ) | SA CV 03-1805-JW (MLGx); & |
| CONSOLIDATED CASE ACTIONS. | ) | SA CV 03-1807-JW (MLGx) |
| | ) | |

**REQUEST BY PLAINTIFF ACACIA FOR LIMITED AMENDMENT
TO THE PROPOSED ORDER APPOINTING SPECIAL MASTER**

By order dated March 1, 2004, this Court directed any party objecting to the appointment of Mr. Schulz to file a written objection within fourteen days of this Order. Plaintiff does not object to the appointment of Mr. Schulz. For the reasons set forth below, however, Plaintiff Acacia respectfully requests this Court to amend in

1 limited respects its proposed order appointing a special master. This limited request is
2 based on counsel's actual experience in patent cases where special masters have been
3 engaged, and certain consequences that have occurred as a result of those past
4 appointments that were unintended by both the Court and the parties.
5 **Requested Change No. 1:**
6     To substitute the term "Technical Consultant" for "Special Master," and more
7 specifically to describe the scope of the engagement.
8 **Reason for Requested Change No. 1:**
9     Counsel understood that the Court sought technical support only. The draft
10 order, although indicating Mr. Schulz would provide technical assistance to the Court,
11 did not limit the consulting services to technological subject matter. Special Masters
12 are frequently consulted by Courts to assist in determining issues of patent law and
13 mixed issues of fact and law as well as technical issues. If counsel's understanding of
14 the scope of the Court's requested services of Mr. Schulz is correct, Acacia
15 respectfully requests that the appointment order reflect the limited but very important
16 technological scope of Mr. Schulz's engagement.
17 **Requested Change No. 2:**
18     To obligate the parties to this action to inform all other parties to this action of
19 the specific nature of any request for technological information by Mr. Schulz and the
20 specific information actually provided to Mr. Schulz.
21 **Reason for Requested Change No. 2:**
22     To assure that the Court and all parties are fully apprised of the specific
23 communications that occur between any party and the technical expert.
24 **Requested Change No. 3:**
25     When required, to have the technical expert read deposition transcripts rather
26 than actually attend depositions.
27 **Reason for Requested Change No. 3:**
28     To simultaneously assure both that the technical expert has access to and

-2-

1  receives the fruits of all discovery, including deposition transcripts, necessary for the
2  technical expert to fully assist this Court, and that unnecessary costs are not expended
3  by the parties in the process of providing that information to the expert. For example,
4  it will be much more efficient and less costly for the technical expert to receive
5  deposition transcripts rather than to actually attend depositions.
6      Counsel for Acacia has prepared both a proposed, interlineated order for this
7  Court's consideration, a copy of which is attached, which sets for the proposed
8  modifications to the earlier proposed order and a clean copy of the newly proposed
9  order.

10                                 Respectfully submitted,

12  Dated: _Mann 15, 2004_        By: _____
13                                      Roderick G. Dorman

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| ACACIA MEDIA TECHNOLOGIES CORPORATION, <br><br> _____ Plaintiff(s), <br><br> _____ vs. <br><br> NEW DESTINY INTERNET GROUP, <br><br> _____ Defendant(s). <br><br> AND ALL RELATED AND/OR CONSOLIDATED CASE ACTIONS. | **Consolidated Cases:** <br><br> SA CV 02-1040-JW (MLGx); <br> SA CV 02-1048-JW (MLGx); <br> SA CV 02-1063-JW (MLGx); <br> SA CV 02-1165-JW (MLGx); <br> SA CV 03-0217-JW (MLGx); <br> SA CV 03-0218-JW (MLGx); <br> SA CV 03-0219-JW (MLGx); <br> SA CV 03-0259-JW (MLGx); <br> SA CV 03-0271-JW (MLGx); & <br> SA CV 03-0308-JW (MLGx) <br><br> **Related Cases:** <br><br> SA CV 03-1610-JW (MLGx); <br> SA CV 03-1800-JW (MLGx); <br> SA CV 03-1801-JW (MLGx); <br> SA CV 03-1802-JW (MLGx); <br> SA CV 03-1803-JW (MLGx); <br> SA CV 03-1804-JW (MLGx); <br> SA CV 03-1805-JW (MLGx); & <br> SA CV 03-1807-JW (MLGx) |

## [PROPOSED] ORDER APPOINTING ~~SPECIAL MASTER~~TECHNICAL CONSULTANT

On February 6, 2004, the Court conducted a claims construction hearing. (The Court incorporates its February 6, 2004 minute order.) Pursuant to stipulation of the parties to this consolidated and related action and pursuant to Federal Evidence Code

Section 706, the Court appoints Rainer Schulz as an expert in this case, under the following terms:

1. From time-to-time, at the request of the Court, Mr. Schulz will ~~consult with~~serve as a consultant for the Court on the technology issues involved in this case.

2. Mr. Schulz will not be called upon to testify as a witness in any proceedings in the case.

3. At his discretion, Mr. Schulz may contact counsel for one or more parties to obtain documents or information pertinent to his appointment. In making any such request, all parties shall be notified <u>by the party from whom information is requested</u> of the <u>specific</u> ~~inquiry~~<u>information requested</u> and of the ~~response.~~<u>specific information provided in response to any such request.</u> All responses are subject to any protective order which applies to this case. In this regard, neither the parties nor their counsel shall initiate contact with Mr. Schulz. All contact shall be in response to contact initiated by Mr. Schulz.

4. Mr. Schulz may attend any court proceedings.

5. Mr. Schulz may ~~attend any depositions or~~<u>receive any deposition transcripts or transcripts of</u> other discovery proceedings, particularly those involving testimony of experts.

6. Mr. Schulz may review any documents submitted to the Court.

<u>7.</u> The parties are directed to pay the reasonable fees charged by Mr. Schulz for his service as a consultant to the Court in this case All matters pertaining to the fees of Mr. Schulz are referred to the Magistrate Judge assigned to this case. Unless the Magistrate Judge orders otherwise, one-half of the fees of Mr. Schulz shall be paid by the plaintiff. One-half of the fees of Mr. Schulz shall be paid by the defendants. Within 30 days of this order, all Defendants who have appeared in the Consolidated action and any defendant in any related action shall confer among themselves to determine an apportionment for purposes of payment of Mr. Schulz's fees. Any dispute over the apportionment shall be resolved by the assigned Magistrate Judge.

1   If a new Defendant appears in this consolidated action or in any related action, the

2   Defendants shall again confer to determine an apportionment.

3   ~~Any party objecting to the appointment of Mr. Schulz shall file a written objection~~

4   ~~within 14 days of this order. The objection shall state the ground for the objection.~~

5   ~~Upon filing of any objection, this order is stayed until further order of this Court.~~

6

7   DATED:

8                                                    JAMES WARE
                                                     United States District Court
9

10  Presented By:

11

12      _____/s/_____

13  Roderick G. Dorman
    for Hennigan, Bennett & Dorman LLP
14  Attorneys for Plaintiffs

15

16

17

18

19

20

21

22

23

24

25

26

27

28

384444\v2

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | | |
|---|---|---|
| ACACIA MEDIA TECHNOLOGIES CORPORATION, | ) ) ) | **Consolidated Cases:** |
| | ) ) ) ) | SA CV 02-1040-JW (MLGx); SA CV 02-1048-JW (MLGx); SA CV 02-1063-JW (MLGx); SA CV 02-1165-JW (MLGx); |
| Plaintiff(s), | ) ) ) | SA CV 03-0217-JW (MLGx); SA CV 03-0218-JW (MLGx); |
| vs. | ) ) ) | SA CV 03-0219-JW (MLGx); SA CV 03-0259-JW (MLGx); |
| NEW DESTINY INTERNET GROUP, | ) ) ) | SA CV 03-0271-JW (MLGx); & SA CV 03-0308-JW (MLGx) |
| | ) ) | **Related Cases:** |
| Defendant(s). | ) ) ) | SA CV 03-1610-JW (MLGx); SA CV 03-1800-JW (MLGx); |
| | ) ) | SA CV 03-1801-JW (MLGx); SA CV 03-1802-JW (MLGx); |
| | ) ) | SA CV 03-1803-JW (MLGx); SA CV 03-1804-JW (MLGx); |
| AND ALL RELATED AND/OR CONSOLIDATED CASE ACTIONS. | ) ) ) ) | SA CV 03-1805-JW (MLGx); & SA CV 03-1807-JW (MLGx) |

## [PROPOSED] ORDER APPOINTING TECHNICAL CONSULTANT

On February 6, 2004, the Court conducted a claims construction hearing. (The Court incorporates its February 6, 2004 minute order.)  Pursuant to stipulation of the parties to this consolidated and related action and pursuant to Federal Evidence Code Section 706, the Court appoints Rainer Schulz as an expert in this case, under the

following terms:

1. From time-to-time, at the request of the Court, Mr. Schulz will serve as a consultant for the Court on the technology issues involved in this case.

2. Mr. Schulz will not be called upon to testify as a witness in any proceedings in the case.

3. At his discretion, Mr. Schulz may contact counsel for one or more parties to obtain documents or information pertinent to his appointment. In making any such request, all parties shall be notified by the party from whom information is requested of the specific information requested and of the specific information provided in response to any such request. All responses are subject to any protective order which applies to this case. In this regard, neither the parties nor their counsel shall initiate contact with Mr. Schulz. All contact shall be in response to contact initiated by Mr. Schulz.

4. Mr. Schulz may attend any court proceedings.

5. Mr. Schulz may receive any deposition transcripts or transcripts of other discovery proceedings, particularly those involving testimony of experts.

6. Mr. Schulz may review any documents submitted to the Court.

7. The parties are directed to pay the reasonable fees charged by Mr. Schulz for his service as a consultant to the Court in this case All matters pertaining to the fees of Mr. Schulz are referred to the Magistrate Judge assigned to this case. Unless the Magistrate Judge orders otherwise, one-half of the fees of Mr. Schulz shall be paid by the plaintiff. One-half of the fees of Mr. Schulz shall be paid by the defendants. Within 30 days of this order, all Defendants who have appeared in the Consolidated action and any defendant in any related action shall confer among themselves to determine an apportionment for purposes of payment of Mr. Schulz's fees. Any dispute over the apportionment shall be resolved by the assigned Magistrate Judge.

If a new Defendant appears in this consolidated action or in any related action, the Defendants shall again confer to determine an apportionment.


DATED: _____    _____
                                    **JAMES WARE**
                                    United States District Court


Presented By:


_____/s/_____
Roderick G. Dorman
for Hennigan, Bennett & Dorman LLP
Attorneys for Plaintiffs

# Exhibit 2

1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | | |
|---|---|---|
| 9 | ACACIA MEDIA TECHNOLOGIES CORPORATION, | ) ) | SA CV 02-1040-JW(MLGx); |
| 10 | | ) | **Consolidated Cases:** |
| 11 | Plaintiff(s), | ) ) | SA CV 02-1048-JW(MLGx); SA CV 02-1063-JW(MLGx); |
| 12 | | ) ) | SA CV 02-1165-JW(MLGx); SA CV 03-0217-JW(MLGx); |
| 13 | vs. | ) ) | SA CV 03-0218-JW(MLGx); SA CV 03-0219-JW(MLGx); |
| 14 | | ) ) | SA CV 03-0259-JW(MLGx); SA CV 03-0271-JW(MLGx); & |
| 15 | NEW DESTINY INTERNET GROUP,*ET AL.*, | ) | SA CV 03-0308-JW(MLGx) |
| 16 | | ) | **Related Cases:** |
| 17 | Defendant(s). | ) ) | |
| 18 | | ) ) | SA CV 03-1801-JW(MLGx); SA CV 03-1803-JW(MLGx); |
| 19 | AND ALL RELATED AND/OR CONSOLIDATED CASE ACTIONS. | ) ) | SA CV 03-1804-JW(MLGx); SA CV 03-1805-JW(MLGx); & |
| 20 | | ) | SA CV 03-1807-JW(MLGx) |

21

### *MARKMAN* ORDER

22
## I.    INTRODUCTION

23    This is a patent infringement case, in which the Plaintiff, Acacia Media Technologies

24  Corporation, ("Acacia") asserts that various internet based adult entertainment providers

25  (collectively, "Defendants") infringe both U.S. Patent No. 5,132,992 (the '992 patent) and U.S.

26  Patent No. 6,144,702 (the '702 patent) (collectively, the "patents-in-suit").

27

28

The Court conducted a hearing on four separate days in accordance with *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996), to construe the disputed terms and phrases of the asserted claims.[1] This Order gives the Court's construction of some of the disputed terms and phrases and invites further briefing or motions with respect to other terms.

## II.  Prosecution History of the '702 Patent and the '992 Patent

Both the '992 patent and the '702 patent, are members of the Yurt family of patents that includes five issued patents, all claiming a priority date of the '992 patent and sharing a common specification.[2] The '702 patent is a division of application Ser. No. 08/630,590, filed April 10, 1996, which issued as U.S. Pat. No. 6,002,720, which is a continuation of application Ser. No. 08/133,982, filed October 8, 1993, which issued as U.S. Pat. No. 5,550,863, which is a continuation of application Ser. No. 07/862,508, filed April 2, 1992, which issued as U.S. Pat. No. 5,253,275, which is a continuation application of Ser. No. 07/637,562, filed January 7, 1991, which issued as the '992 patent.

## III.  STANDARDS

The construction of the claims in a patent is a matter left to the province of the court. *Markman*, 517 U.S. at 391. A court's objective is to determine the plain meaning, if any, that those of ordinary skill in the art would apply to the language used in the patent claims. *Warner v. Ford Motor Co.*, 331 F.3d 851, 854 (Fed. Cir. 2003) (citing *Rexnord v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001)). While the court may look to pertinent art dictionaries, treatises and encyclopedias for assistance, *Texas Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1202-03 (Fed. Cir. 2002), the intrinsic record is the best source of the meaning of claim language. *Vitronics Corp. v. Conceptronics, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). Unless the inventor

---

[1] The Court conducted hearings in the Central District of California at the Santa Ana Federal Courthouse on February 6, 2004; April 9, 2004; May 18, 2004; and May 19, 2004.

[2] The Court notes that applicants did make corrections to the specification of the '702 patent, such as adding the phrase "[t]he receiving system recognizes copy protected programs and disables the audio-video recorder." *See* Miller Decl., Ex. GG ('702 prosecution history) at 211. Nothing in this Order shall be construed as endorsing any claimed priority dates of the patents-in-suit.

has manifested an express intent to depart from the ordinary and accustomed meaning that patent claim language has in the art, there is a heavy presumption that the inventor intended the ordinary meaning to apply. *See Teleflex Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002) (*en banc*) (citation omitted); *Bell Atlantic Network Servs., Inc. v. Covad Communications Group, Inc.*, 262 F.3d 1258, 1268 (Fed. Cir. 2001) (citation omitted). The use of extrinsic evidence in the claim construction process is "proper only when the claim language remains genuinely ambiguous after consideration of the intrinsic evidence." *Interactive Gift Express, Inc. v. Compuserve Incorp.*, 256 F.3d 1323, 1332 (Fed. Cir. 2001).

## IV.     DISCUSSION

### A.     Claim 1 of the '992 Patent

There are fifty-eight claims in the '992 patent, six of which are independent claims. The Court requested that the parties submit a list of disputed terms and phrases appearing in two independent claims: claim 1, an apparatus claim, and claim 41, a method claim. The Court explained that it would construe additional terms in the '992 patent at a later date, if requested by the parties.

With the disputed terms and phrases in bold, Claim 1 of the '992 patent recites:

> 1. A transmission system for providing information to be transmitted to **remote locations,** the transmission system comprising:
>
> **library means for storing items containing information; identification encoding means for retrieving the information in the items from the library means and for assigning a unique identification code to the retrieved information;**
>
> conversion means, coupled to the **identification encoding means,** for placing the retrieved information into a predetermined format as formatted data;
>
> **ordering means, coupled to the conversion means, for placing the formatted data into a sequence of addressable data blocks;**
>
> compression means, coupled to the ordering means, for compressing the formatted and sequenced data blocks;
>
> **compressed data storing means,** coupled to the data compression means, **for storing as files the compressed, sequenced data blocks received from the data compression means with the**

> **unique identification code assigned by the identification encoding means**; and

> transmitter means, coupled to the compressed data storing means, for sending at least a portion of one of the files to one of the **remote locations**.

('992 patent, 20:14-40) (emphasis added).

> **1.** A transmission system for providing information to be transmitted to **"remote locations"**

The parties request construction of the term "remote locations" that appears in claims 1, 19, 22, 25, 41, 47 and 54 of the '992 patent. Acacia contends that the term should have its ordinary and customary meaning, such that "remote locations" means "positions or sites distant in space from the position(s) or site(s) of the transmission system." To support its position, Acacia points to various parts of the claim language and the specification.

Defendants contend that the word "locations" simply is the plural of "location" and has a commonly understood meaning of more than one place or site. Defendants assert that the dispute centers upon the term "remote." Defendants contend that the term "remote locations" should be construed to mean "more than one location selected by the user."

The Court finds that the ordinary meaning of the term "remote locations" is "positions or sites distant in space from some identified place." In the context of claims 1 and 41, the ordinary meaning of the term is "positions or sites distant in space from the transmission system." In the context of claim 1 the term "remote locations" is described in relation to the transmission system in the preamble that recites "[a] transmission system for providing information to be transmitted to remote locations ..." Similarly, in claim 41 the "remote locations" are sites remote from the transmission system to which at least a portion of the file is sent.

Unlike other claims of the '992 patent that describe systems responsive to requests from a user (*e.g.,* claims 19 and 47), there is no such limitation included in independent claims 1 and 41. Specifically, claims 19 and 47 contain additional limitations that the remote location be specified by the user of the system. In other words, the term "remote locations" is used consistently by the

4

inventors in all claims but the inventors added additional words that limit the term to a remote location selected by the user in claims 19 and 47.

Defendants' proposed construction of "remote locations" would read the limitations of claims 19 and 47 into broader claims, a construction that would violate the doctrine of claim differentiation. "It is improper for a court to add 'extraneous' limitations to a claim, that is, limitations added 'wholly apart from any need to interpret what the patentee meant by particular words or phrases in the claim.'" *Hoganas AB v. Dresser Indus., Inc.*, 9 F.3d 949, 950 (Fed. Cir. 1993) (quoting *E.I. Du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433, (Fed. Cir.), *cert. denied*, 488 U.S. 986 (1988); *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1122 (Fed. Cir. 1985) ("It is settled law that when a patent claim does not contain a certain limitation and another claim does, that limitation cannot be read into the former claim in determining either validity or infringement.").

The Court looks to the specification to determine "whether the presumption of ordinary and customary meaning is rebutted." *Tex. Digital Sys.*, 308 F.3d at 1204; *see also Inverness Med. Switz. Gmbh v. Princeton Biomeditech Corp.*, 309 F.3d 1365, 1371-72 (Fed. Cir. 2002). The specification discloses a configuration that does not require a user to select a particular location. Figure 1g of the '992 patent shows a transmission system distributing to a receiving system, which preferably transmits requested material over airwave communication channels to a plurality of users. ('992 patent, 4:53-57). Also, the specification discloses "[t]he transmission system 100 of the present invention preferably further includes transmitter means 122, coupled to the compressed data library 118, for sending at least a portion of a specific file to at least one remote location." ('992 patent, 15:61-65).

Here, the specification does not overcome the heavy presumption that the plain and ordinary meaning should apply. *See CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002)); *see also Mantech Envtl. Corp. v. Hudson Envtl. Servs., Inc.*, 152 F.3d 1368, 1374 (Fed. Cir. 1998) ("If the written description supports the definition of the term that is apparent from the claim limitation, then reading in a further limiting definition would be improper."); *Specialty Composites v. Cabot Corp.*, 845 F.2d 981, 987 (Fed. Cir. 1988) ("Where a

specification does not require a limitation, that limitation should not be read from the specification into the claims.").

Next, the Court considers statements made in the prosecution history of the '992 patent, as well as related patents that share the same specification, to determine whether the patentee effected a disclaimer of claim scope. *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1349-50 (Fed. Cir. 2004). Such a disclaimer requires clear and unmistakable statements of disavowal. *See Cordis Corp. v. Medtronic AVE, Inc. at el.*,339 F.3d 1352, 1358 (Fed. Cir. 2003) (citing *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1325 (Fed. Cir. 2003)).

A "Petition to Make Special" allows an application to request an accelerated examination of an application. In exchange, the applicant must conduct a preexamination search and must provide "a detailed discussion of the references, which points out, ... how the claimed subject matter is distinguishable over the references." M.P.E.P. § 708.02. VIII (1989). In distinguishing the claimed invention from U.S. Patent No. 4,890,320 (hereinafter, "*Monslow*") that issued in 1989, the applicants explained that in *Monslow* "the viewer-chosen program is transmitted to the television receiver of the requesting viewer." (Miller Decl., Ex. B., p. 156). In distinguishing the claimed invention from U.S. Patent No. 4,506,387 (hereinafter, "*Walter*") that issued in 1985, the applicants explained that *Walter* "requires that the viewer be at the location for both ordering and viewing the audio/video material." *Id.* In distinguishing U.S. Patent No. 4,763,191 (hereinafter "*Gordon*") that issued in 1988, the applicants explained that *Gordon* did not disclose a provision for storage of requested programming before transmission to the user or for storage before the programming is played. *Id.*

The Court finds that there was no clear disavowment of claim scope during the prosecution history of the '992 patent that limits the plain and ordinary meaning of the term "remote locations." While the prior art references disclosed a system where the requesting device, either a telephone or a computer, is physically located at the same location as the receiving system, the applicants distinguished the present invention in that none of the references provided for the storing of the information at the receiving system location so that the information may be played back at a later time selected by the user. Thus, the requester of the

6

information may be physically located at a "remote location," because the prior art was overcome for more than one reason, creating no disavowment of claim scope.

Defendants contend that the applicants clearly disavowed and thereby limited the term "remote locations" by a statement made during the prosecution of the '720 patent application, a patent in Yurt family that issued in 1998. In the '720 patent application, the applicants amended a claim in response to an examiner's rejection. The applicants stated "to clarify remote location to which the information is transmitted is different from the accessing location at which the user is positioned when making the request." (Miller Decl., Ex. L, p. 502). The amendment and alleged disavowment were in response to the examiner's rejection of the claim as anticipated by U.S. Patent No. 5,195,092 (hereinafter, "*Wilson et al.*") that issued on March 16, 1993.

At the First *Markman* Hearing held on February 6, 2004, Defendants asserted that *Microsoft Corp. v. Multi-Tech Sys., Inc.* allowed a court to rely on comments made in subsequent related patent prosecutions to interpret disputed claims of previous issued patents. The Court disagrees. In *Microsoft*, the Federal Circuit stated that it was relying on comments directed at the common specification shared by both of the patents and was not relying on comments made regarding amendments to claims. *See Microsoft*, 357 F.3d at 1349 n5.

During claims construction of the '992 patent that issued in 1992, it would be improper for the Court to consider a comment made during prosecution of a related patent (the '720 patent) regarding an amendment to a claim made in 1998 to overcome 1993 prior art. *See id*; *Georgia-Pacific Corp. v. United States Gypsum Co.*, 195 F.3d 1322 (Fed. Cir. 1999).

Therefore, the Court finds "remote locations" to have its ordinary meaning "positions or sites distant in space from some identified place or places." In claims 1 and 41 of the '992 patent, the term "remote locations" means "positions or sites distant in space from the transmission system."

### 2. "library means for storing items containing information" (claim 1 of the '992 patent)

The parties request that the Court construe the phrase "library means for storing items containing information" that appears in claim 1 of the '992 patent.

7

Acacia contends that the phrase "library means for storing items having information" is not a means-plus-function limitation, because sufficient structure for performing the claimed function is disclosed in the claim. Acacia contends that sufficient structure is elaborated in claim 1 by including the term "library." Acacia supports its position through use of a dictionary that defines the term "library" as "a place where materials are kept or a collection of such materials." Also, Acacia relies on the specification stating that "the library has a geographical location and that multiple libraries in a system may communicate with one another. ('992 patent, 2:65-66; 6:23-30; and 15:13-15)." (Acacia's Claim Construction Brief, January 8, 2004).

Defendants contend that sufficient structure is not recited in the claim. Defendants contend that the claimed function of "storing items containing information" should be construed to require that the library means must have items containing information that may be readily accessed for use by the transmission system, *i.e.*, the library is part of the transmission system. Defendants contend that although a generic "library" is capable of retaining items at a particular location, a generic library does not make these items available for use by the claimed transmission system. Defendants assert that the only type of library that performs the claimed function is the "source material library" disclosed in the specification.

The use of the term "means for" in a claim limitation creates a rebuttable presumption that the limitation is drafted in § 112, ¶ 6 format. *NCR Corp. v. Palm, Inc.*, 217 F. Supp. 2d 491, 502 (D. Del. 2002) (citing *Kemco Sales, Inc. v. Control Papers, Co.*, 208 F.3d 1352, 1361 (Fed. Cir. 2000). One can rebut that presumption by showing that the claim itself recites sufficiently definite structure to perform the claimed function. *Id. See also Envirco Corp. v. Clestra Cleanroom, Inc.*, 209 F.3d 1360 (Fed. Cir. 1994);[3] *Unidynamics Corp. v. Automatic Prods. Int'l*

---

[3]In *Envirco Corp. v. Clestra Cleanroom, Inc.*, 209 F.3d 1360 (Fed. Cir. 1994), the claim at issue described a centrifugal fan and filter assembly for clean room environments. The district court had construed "second baffle means" as a means-plus-function element and had looked to the specification to determine its corresponding structure. The first embodiment described a baffle having continuous arcuate surfaces; the district court found that the claims required such arcuate structure. Since the accused product had baffles formed of L-shaped material, the district court granted summary judgment of non-infringement.
    On appeal, the Federal Circuit reversed, noting that while the district court had properly

8

*Ltd.*, 157 F.3d 1311, 1319 (Fed. Cir. 1998)[4]

The clause "library means for storing items having information" is written such that the means-plus-function presumption of § 112, ¶ 6 does apply. *See Greenberg v. Ethicon Endo Surgery, Inc.*, 91 F.3d 1580 (Fed. Cir. 1996) ("Claim drafters conventionally use the preface 'means for' (or 'step for') when they intend to invoke section 112(6), and there is therefore seldom any confusion about whether section 112(6) applies to a particular element."); *Sage Prods.*, 126 F.3d at 1427. "This presumption is overcome in two ways." *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1347 (Fed. Cir. 2002).

"First, a claim element that uses the word 'means' but recites no function corresponding to the means does not invoke § 112, ¶ 6." *Allen Eng'g Corp.*, 299 F.3d at 1347 (citations omitted).

In the case at hand, the presumption is not overcome by the first method because there is a function corresponding to the means recited in the claim: "library means **for storing items having information**." ('992 patent, 20:17) (emphasis added).

"Second, even if the claim element specifies a function, if it also recites sufficient structure or material for performing that function, § 112, ¶ 6 does not apply." *Allen Eng'g Corp.*, 299 F.3d at 1347 (citations omitted).

Here, the issue is whether the term "library" is a sufficient recital of structure to perform the function.

---

performed the first part of the analysis, it had failed to perform the second part of the analysis, which is to determine whether the means clause cited sufficient structure to stand upon its own without invoking § 112, ¶ 6 to identify the claimed structure. The court concluded that the patentee had rebutted the presumption and thus the element was not subject to § 112, ¶ 6 .

[4]In contrast, the Federal Circuit construed "spring means tending to keep the door closed" to be means-plus-function in *Unidynamics Corp. v. Automatic Prods. Int'l Ltd.*, 157 F.3d 1311, 1319 (Fed. Cir. 1998). The Federal Circuit agreed with the lower court that the term "spring" is a structural term, but held that the remainder of the clause was intended to invoke means-plus-function treatment, and that the use of a structural term in the clause did not vitiate this intent, given the statement in the specification that the disclosed "spring 46 is an example of spring means tending to keep the door closed." In other words, the use of the words "is an example of" did not stop the court from limiting the claim to that example. *Id.*

The Court finds that the term "library" does not provide sufficient structure to overcome the presumption that the patentees' use of the term "means for" was not intended to invoke § 112, ¶ 6. Even if the term "library" is considered a structural term, the remainder of the clause invokes means-plus-function treatment, and the use of a structural term in the clause does not vitiate the patentees' intent. *See Unidynamics Corp. v. Automatic Prods. Int'l Ltd.*, 157 F.3d at 1319 (citing *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1536, 19 USPQ2d 1367, 1369 (Fed. Cir.1991) ("The recitation of some structure in a means-plus-function element does not preclude the applicability of section 112.")).

Moreover, a generic library by itself is not integrated with the claimed invention and does not make the information available. A particular kind of library, a "source material library" is required in the claimed invention.[5]

---

[5]Every section of the specification that Acacia relies on in support of its position that "library" connotes sufficient structure, makes reference not to a "library" but instead a "source material library." *See* '992 patent, 2:65-66 ("Additionally, the present invention comprises a receiving system responsive to a user input identifying a choice of an item stored in a **source material library** to be played back to the subscriber at a location remote from the **source material library**.") (emphasis added); '992 patent, 6:23-30 ("The **source material library** 111, ... may preferably include a single source material library or a plurality of **source material libraries**. ... The plurality of **source material libraries** ...") (emphasis added); and '992 patent, 15:13-15 ("It is possible to process orders and operate a database of available titles at multiple locations remote of the **source material library 111**.") (emphasis added).

Moreover, comments made by the applicants during the prosecution of the '992 patent require that the library means be limited to the corresponding structure identified in the specification as the "source material library." In the First Office Action of the '992 patent application, the examiner rejected claims 1-6, and a multitude of others as being anticipated by "*Lang*." (Miller Decl., January 8, 2004; Ex. B at 183-185). The examiner stated that "*Lang* discloses a video/audio storage system which is capable of providing information to remote locations. See Fig. 2 for library means (11)." *Id.* at 183 (emphasis added). The applicants disagreed with the examiner. They asserted that *Lang* envisioned a library at some time in the future because *Lang* lacked the knowledge of how to incorporate such a library. *Id.* at 209. Applicants stated that they solved the problems left open in *Lang*. *Id.* The applicants further disputed whether *Lang* disclosed the recited identification encoding means "because the functions of the identification encoding means are to retrieve of [sic] information from the source material library means and to assign a unique identification code to the retrieved information." *Id.* Thus, to overcome *Lang*, the applicants disavowed any corresponding structure of "library means" other than a "source material library."

Having concluded that "library means" is drafted in means-plus-function form, construction of that limitation requires two steps. *Asyst Techs., Inc. v. Empak, Inc.*, 268 F.3d 1364, 1369 (Fed. Cir. 2001). First, the Court must identify the function recited in the claim. *Id.* "Second, the court must identify the corresponding structure set forth in the [specification] that performs the particular function set forth in the claim." *Id.*

The function of "library means" is "storing items containing information."

The Court construes the term "items containing information" to mean "items containing information in analog or digital format." The limitation requiring the information be stored in analog or digital format is necessary as the conversion means element 113 only converts analog and digital inputs into a "formatted data" output.[6] ('992 patent, figure 2a). To preserve validity of the patent, the applicants limited claim 1 of the '992 patent as well as other claims involving a source material library to envelop only retrieving "information in the items." ('992 patent, 20:19). Although the specification discloses musical instruments and books being stored in the source material library, it does not enable retrieval of such items, much less conversion of such information in the items into the required input format acceptable by the conversion means (figure 2a (113)). ('992 patent, figure 2a).

///
///
///
///
///
///
///

[6]Neither the claims nor the specification of the '992 patent disclose any structure for converting information in the "items" to analog or digital form as required by the "conversion means," before the items are stored in the library means. The claims and the specification disclose structure (figure 2a (113)), which converts only analog or digital information. Before the items are stored, the information in the "items" stored in the library means must out of necessity already be in analog or digital format.

11



*FIG. 2a*

The Court finds that the corresponding structure of "library means" is the "source material library," as represented by block 111 of Figure 2a of the '992 patent. The claim element covers this corresponding structure and its equivalents.[7]

**3.    "identification encoding means for retrieving the information in the items from the library means and for assigning a unique identification code to the retrieved information"**

**a.    "identification encoding means"**

The parties agree that the term "identification encoder means" should be construed under § 112, ¶6. The identification encoding means disclosed in claim 1 of the '992 patent has two functions: (1) "retrieving the **information in the items** from the library means" and (2) "assigning a **unique identification code** to the retrieved information." ('992 patent, 20:19-21) (emphasis added). The Court will construe these two functions and then look to the specification

_____

[7] In addition to reasons stated above, a "compressed data library" is not considered a corresponding structure of a library means because it represents the corresponding structure for a "compressed data storing means." Compare claim 1 of the '992 patent col. 20, line 17 ("library means ...") with line 32 ("compressed data storing means, coupled ..."). *See e.g.* '992 patent at 12:48, 12:59-66, and 13:9-13.

12

for corresponding structure.

### 1. retrieving the "information in the items from the library means"

The Court gives the term "retrieve" its ordinary meaning -- "to get something back." In this case, the function of the identification encoding means is to get back the information that is contained in the items which are stored in the source material library.

### 2. assigning a "unique identification code to the retrieved information"

Although it is undisputed that the "identification encoding means" must assign a "unique identification code," the parties dispute the meaning of the term "unique identification code." The term does not have a plain and ordinary meaning. The language of claim 1 of the '992 patent, clarifies that a unique identification code identifies information stored possibly in more than one file and that the unique identification code is stored in the presence of files containing the information to be stored.

The specification refers to a "unique address code" that *is not* synonymous with the unique identification code. The "unique address code is an address for uniquely identifying the compressed data items stored in the compressed data library section of a library system." ('992 patent, 10:48-50). "The unique address code makes access to the requested data possible." ('992 patent, 10:64-65). Also separately defined in the specification and thus not to be considered a unique identification code is program notes and popularity codes. ('992 patent, 6:48-54).

In summary, the unique identification code is not a genus that includes all other codes, such as, the popularity code, unique address code, program notes, item title, and file name. Instead, the unique identification code is assigned by the identification encoding means and accompanies information stored as compressed sequenced data through the data compression process. ('992 patent, 10:20-22).

The specification is ambiguous, *inter alia*, with regards to whether the unique identification code is assigned to "the item" or to "the information in the item."

For instance, in the specification states:

> "[p]rior to being made accessible to a user of the transmission and receiving system of the present invention, the item must be stored in at least one compressed data library 118, and given a unique identification code by identification encoder 112."

('992 patent, 6:35-39).

This passage can reasonably be read to provide that the item itself is stored and that the item itself is given a unique identification code.

In another instance, the specification describes that a file containing compressed audio and video data "is addressable through the unique identification code assigned to the data by the identification encoder 112." ('992 patent, 10:28-30). This language suggests that the unique identification code is assigned to "data," which means the information in the item.

Similarly, the "Summary of the Invention" section of the specification describes the identification encoder means assigning a unique identification code to information retrieved from the source material library. ('992 patent, 2:33-34).

Accordingly, the Court construes the function "assigning a unique identification code to the retrieved information" to mean "assigning a one-of-a-kind identifier to the information retrieved from an item that identifies the retrieved information through the conversion, ordering, compression, and storing processes."

The Court now examines the specification for corresponding structure which performs these functions.

Acacia contends that the structure corresponding to the "identification encoding means" is:

(1) a human being;

(2) computer software;

(3) an identification encoder, and all equivalents.[8]

_____

[8]"[A] person (*e.g.* system operator), an identification encoder, and computer software having source material utilization capabilities, and all equivalents thereof." (Joint Claim Construction Chart, Docket Item No. 151).

14

Defendants contend that there is no corresponding structure because (1) human beings are not structures, (2) the dispatching control software disclosed in the specification is not linked to the identification encoder, and (3) the "identification encoder" is a functional term that does not connote structure. The Court will consider these in order.

### (1) A Human Being As Corresponding Structure for the Identification Encoding Means"

To support its argument that a human being is disclosed in the specification as corresponding structure for the "identification encoding means," Acacia refers to a passage in the specification which mentions a human being:

> FIG. 7 is a flow chart 400 of a preferred method of distribution of the present invention. The distribution method is preferably responsive to requests identifying information to be sent from the transmission system 100 to remote locations. **Method 400 assumes that the items have already been stored in compressed data library 118.**
> As illustrated in FIG. 7, **the first step of the distribution method 400 involves retrieving the information for selected items in the source material library 111, upon a request by a user of the distribution system (step 412). This is analogous to taking books off of a shelf at the local public library after the person has decided that he or she would like to read them.**

('992 patent, 18:46-59) (emphasis added).

Defendants contend that this reference to a person taking books off of a library shelf as analogous to a distribution "method" is not disclosure of a human being as corresponding structure of "identification encoding means." Defendants point out that the specification refers to a method and make no reference to the structure under consideration. In addition, Defendants point out that in the cited analogy the item itself is retrieved by the person. The claim requires corresponding structure for retrieving "the information in the item."

The Court finds that the language of claim 1 supports Defendants' position. As discussed above, corresponding structure to the "identification encoding means" must retrieve **"the information in the items** from the library means." ('992 patent, 20:19-20) (emphasis added).[9]

---

[9] Claim 1 of the '992 patent recites, in pertinent part, that:
    1. A transmission system for providing information to be

15

The specification describes "retrieving the information for selected items in the source material library" and does not mention retrieving the item itself.[10] ('992 patent, 18:53-56).

Except for the Figure 7 analogy above to a library user, there is no other discussion in the specification which could be understood by one skilled in the relevant art as disclosing a human being as corresponding structure for performing the functions of the "identification encoding means." ('992 patent, 20:19-20).[11]

Therefore, the Court finds that there is no disclosure in the specification of a human being as corresponding structure for the identification encoding means. Accordingly, the Court declines to include a human being as corresponding structure in its construction of the "identification encoding means."

### (2) The Dispatching Control Software As Corresponding Structure to the "Identification Encoding Means."

Acacia contends that a computer software program, the dispatching control software, is disclosed as corresponding structure of the "identification encoding means."

Computer software that performs uncommon functions can be corresponding structure in a means-plus-function element if the algorithm or enabling software is disclosed. *See Medical Instrumentation & Diagnostics Corp.*, 344 F.3d at 1211 ("The correct inquiry is to look at the

---

transmitted to remote locations, the transmission system comprising:

library means for storing items containing information;
identification encoding means for retrieving **the information in
the items** from the library means and for assigning a unique
identification code to the retrieved information; ...

('992 patent, 20:14-22).

[10]The Court notes that the elements of the patent under consideration do not claim a structure for retrieving the items themselves. The Court leaves for later consideration the effect, if any of no structure for retrieving the items from the library means.

[11] Because the specification of the '992 patent, does not disclose a human being as a corresponding structure for the identification encoding means, the Court does not reach the legal issue of whether a human being can even be a corresponding structure.

16

disclosure of the patent and determine if one of skill in the art would have understood that disclosure to encompass software for digital-to-digital conversion and been able to implement such a program, not simply whether one of skill in the art would have been able to write such a software program."); *S3, Inc. v. Nvidia*, 259 F.3d 1364, 1369 (Fed. Cir. 2001) ("The claims are directed to the invention that is described in the specification; they do not have meaning removed from the context from which they arose.") (internal quotations omitted).

In the specification, no algorithm for the "dispatching control software"[12] is disclosed to explain how the information in the items stored in the source material library is allegedly retrieved by the software. *See WMS Gaming, Inc. v. Int'l Game Tech*, 184 F.3d 1339, 1348-49 (Fed. Cir. 1999); *see also Tehrani v. Hamilton Med., Inc.*, 321 F.3d 1355, 1362-63 (Fed. Cir. 2003).

In addition, in a means-plus-function claim element, in order for a structure disclosed in the specification to qualify as "corresponding," there must be language in the specification, which would lead one skilled in the art to link that structure to the function. *Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*, 248 F.3d 1303, 1313 (Fed. Cir. 2001) (finding particular structures not to be corresponding structures because "one skilled in the art would not perceive any clear link or association between these structures and the [recited] function of connecting adjacent elements together").

The specification does not disclose the dispatching control software as structure for the identification encoder means, but instead discloses using the software to receive requests from the remote order processing and item database, and to send requests for information through the distribution system. ('992 patent, 17:54-57). In other words, the dispatching control software, *inter alia*, controls the flow of requests, and maintains a list of the available titles in a particular compressed data library when particular titles are not available in the compressed data libraries. The dispatching control software is not a corresponding structure for the identification encoding means because it does not retrieve "the information in the items" but instead manages the

---

[12]To the extent the "identification encoder," which is discussed later in this order, is computer software, the specification does not disclose any algorithm or enabling software.

17

"efficient use of the available distribution channels." ('992 patent, 17:65-66).

"It is not proper to look to the knowledge of one skilled in the art apart from and unconnected to the disclosure of the patent." *Medical Instrumentation & Diagnostics Corp.*, 344 F.3d at 1212.

Here, one skilled in the art would not link the dispatch control software, which is linked to other functions, with the retrieving function of the identification encoding means.[13]  Therefore, the Court declines to include "dispatching control software" as corresponding structure in its construction of "identification encoding means."

### (3)     An Identification Encoder As Corresponding Structure of the "Identification Encoding Means."

The Court now turns its attention to Acacia's contention that the specification discloses an apparatus identified as "identification encoder" as corresponding structure for the "identification encoding means."

The term "identification encoder" is used in the specification.  In the specification of the '992 patent, the patentees explain that "[p]rior to being made accessible to a user of the transmission and receiving system of the present invention, the item must be stored in at least one compressed data library 118, and given a unique identification code by **identification encoder 112.**" ('992 patent, 6:35-39).  Figures 2a and 2b of the '992 patent demonstrate that the unique identification code must be assigned by the identification encoding process, Figure 2a (112), prior to the information being compressed and stored in the compressed data library, Figure 2b (118).  A preferred embodiment describes that the transmission system having a "compressed data storing means, coupled to the compression means, for storing as a file the

---

[13] The specification does not support Acacia's contention that the dispatching control software coordinates the retrieval of information and items from the source material library. (Plaintiff's Supp. Briefing Re Identification Encoding Means, p. 4-7).  The specification of the '992 patent states that "[t]he dispatch software may also preferably coordinate network traffic, source material library 111 utilization, source material library contents, and connection costs." ('992 patent, 17:61-64).  The specification discusses dispatching control software with performing the function of managing the flow of requests such that there is effective utilization of the system not retrieving information in the items.

18

compressed sequenced data with the unique identification code received from the data compression means." ('992 patent, 10:18-22) (emphasis added). The specification describes that a file containing compressed audio and video data "is addressable through **the unique identification code assigned to the data by the identification encoder 112.**" ('992 patent, 10:28-30).

Although the specification identifies a structure called an "identification encoder" ( block 112 in Figure 2a), because the Court is construing a means-plus-function claim, the Court must examine the specification to determine the substance of the identified structure and to determine if the identified structure performs the required functions.

Other than the term itself, the specification contains no description of the structure of an "identification encoder." It is unclear whether it is hardware, software, or as claimed with another element, a human being.

Thus, the issue is whether the use of the term, "identification encoder," without further description connotes sufficient structure to define the bounds of the invention. Acacia contends "identification encoder" can be computer software. However, the specification only defines the identification encoder by its function of assigning a unique identification code and does not disclose any structure, not even computer software.

In a means-plus-function claim, the patentee must disclose sufficient structure in the specification that one of ordinary skill in the art would recognize as being capable of performing the claimed function.[14] In the absence of such a link, the Court cannot create one. *Medical Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205 (Fed. Cir. 2003).

In the *Medical Instrumentation & Diagnostics Corp.* case, the lower court concluded that "the specification is not very explicit in its disclosures of a means for performing a

---

[14] The '992 patent issued in 1992. Prior to 1994, the United States Patent and Trademark Office ("PTO") did not examine applications for compliance with the corresponding structure requirement of § 112, ¶ 6. *See In re Donaldson*, 16 F.3d 1189, 1194 (Fed. Cir. 1994). In *In re Donaldson*, the Federal Circuit ended the "PTO's sweeping and long-standing practice of not applying paragraph six during examination." *Id.* The Federal Circuit explained that "the fact that the PTO may have failed to adhere to a statutory mandate over an extended period of time does not justify its continuing to do so." *Id.*

19

digital-to-digital conversion." *Medical Instrumentation & Diagnostics Corp.*, 344 F.3d at 1211.
Nevertheless, the lower court concluded that because techniques for performing those
conversions were known to those of skill in the art at the time the application was filed, a person
of skill in the art would understand software to be a corresponding structure for the converting
function. *Id.*

On appeal, the Federal Circuit explained that the patentee, MIDCO, presented evidence
before the district court that a skilled programmer at the time of the application's filing could
have written a program for digital-to-digital conversion of image size. *Id.* at 1212. Also,
MIDCO provided examples of programs for digital-to-digital image conversion that would have
been available at the time the patent was filed. *Id.* The Federal Circuit noted, however, that none
of the examples of programs for digital-to-digital conversion were cited in the patent. *Id.*

After acknowledging that a district court should look at the disclosure from the point of
view of one skilled in the relevant art, *id.* (citing *Budde v. Harley-Davidson, Inc.*, 250 F.3d
1369, 1376 (Fed. Cir. 2001), the Federal Circuit reversed the lower court because its inquiry was
not correct. The Federal Circuit explained that "[t]he correct inquiry is to look at the disclosure
of the patent and determine if one of skill in the art would have understood that disclosure to
encompass software for digital-to-digital conversion and been able to implement such a program,
**not simply whether one of skill in the art would have been able to write such a software
program.**" *Id.* (emphasis added) citing (*Atmel Corp. v. Info. Storage Devices, Inc.*, 198 F.3d
1374, 1380 (Fed. Cir. 1999); *see also Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314,
1331-32 (Fed. Cir. 2003) (explaining that statements from experts cannot be used to "rewrite the
patent's specification" to create a clear link where the language in the specification provides
none). "It is important to determine whether one of skill in the art would understand the
specification itself to disclose the structure, not simply whether that person would be capable of
implementing that structure." *Medical Instrumentation & Diagnostics Corp.*, 344 F.3d at 1212
(citing *Atmel*, 198 F.3d at 1382 ("Fulfillment of the § 112, ¶ 6 trade-off cannot be satisfied when
there is a total omission of structure. There must be structure in the specification.")).

20

In this case, the Court cannot define the term "identification encoding means" because there is no corresponding structure in the specification that is linked to the functions recited in the claims.[15] If the Court adopts this finding as its final conclusion on this matter, this would render claims 1, 3, 4, 5, 9, 10 and 11 of the '992 patent indefinite.

The Court invites Acacia to file a motion for an evidentiary hearing on the issue of whether one of skill in the art could identify a corresponding structure and determine the bounds of the "identification encoding means" in view of the specification.

The Court invites the Defendants to file a motion for summary judgment that the term "identification encoding means" is indefinite, rendering claims 1, 3, 4, 5, 9, 10 and 11 of U.S. Patent 5,132,992 to be invalid, respectively, pursuant to 35 U.S.C. § 112, ¶ 2. At the same time, Defendant may file a motion for summary judgment pursuant to § 112, ¶ 1.[16]

The Court will consider these invited motions in accordance with the procedure set forth in the "Conclusion" section of this Order.

///

///

///

///

---

[15]The encoding means identified in claim 1 of the '992 patent has two functions: (1) "retrieving the information in the items from the library means" and (2) "assigning a unique identification code to the retrieved information." ('992 patent, 20:19-21). Although the specification does disclose a human being assigning a unique identification code, it does not disclose what structure he uses to accomplish this function other than the identification encoder (Figure 2a (112)). As mentioned above, the specification does not disclose any structure for the term "identification encoder." Thus, the Court is unable to define a corresponding structure to the "identification encoding means" that is linked to the function of "assigning a unique identification code."

[16] Section 112, ¶ 2 is directed at the claims of the invention, while § 112, ¶ 1 is directed at the relationship of the claims to the specification. Federal Circuit case law allows a district court to address validity under § 112, ¶ 2 during claim construction. Notwithstanding, the Court postpones ruling on the validity of claims under § 112, ¶ 2 until the parties have had an opportunity to present expert testimony. In the interest of time and progressing the litigation initiated in 2002, the Court will also address motions for summary judgment regarding § 112, ¶ 1 on terms that the Court has construed or attempted to construe.

21

4.  "conversion means, coupled to the identification encoding means, for placing the retrieved information into a predetermined format as formatted data; **ordering means, coupled to the conversion means, for placing the formatted data into a sequence of addressable data blocks**"

    a.  **"conversion means"**

The parties do not dispute the meaning of the term conversion means. For clarification of how the term interacts with other disputed terms, the Court notes the meaning of the term. The function of the conversion means is to "place retrieved information into a predetermined format." The specification discloses the "converter," figure 2a (113), as the corresponding structure. The specification explains that "after identification encoding is performed by identification encoder 112, the retrieved information is placed into a predetermined format as formatted data by the converter 113." ('992 patent, 6:59-63). The specification defines the inputs to the converter as data in analog or digital form. ('992 patent, 6:62-66) ("The items stored in source material library 111 and encoded by identification encoder 112 may be in either analog or digital form. Converter 113 therefore includes analog input receiver 127 and digital input receiver 124.").

    b.  **"ordering means"**

Pursuant to § 112, ¶6, the "ordering means, coupled to the conversion means" limitation of claim 1 of the '992 patent recites the function of "placing items into a sequence of addressable data blocks." The corresponding structure of the ordering means is the "time encoder (Figure 2a (114)." ('992 patent, 7:59-8:2 and 8:59-62). The claim element covers this corresponding structure and its equivalents.

    c.  **"coupled to"**

The Court construes the phrase "coupled to" to have its plain and ordinary meaning, which is "directly connected to or attached to." *See e.g.* Webster's Ninth New Collegiate Dictionary 298 (1991) (defining "couple" to mean: to connect for consideration together); *see also CCS Fitness*, 288 F.3d at 1366 (holding that there is a heavy presumption that a claim term carries its ordinary and customary meaning). The term "coupled to" as used in the claims and specification means two elements are directly attached to one another such that using a diskette

22

to transfer information from one to another would mean that the two computers are not "coupled to" one another.[17]

    **d.**    **"placing the formatted data into a sequence of addressable data blocks" (claim 1 and 41 of the '992 patent)**

In light of the Court's construction of the term "ordering means," the phrase "placing the formatted data into a sequence of addressable data blocks" does not require construction.

    **5.**    **"compressed data storing means, coupled to the data compression means, for storing as files the compressed, sequenced data blocks received from the data compression means with the unique identification code assigned by the identification encoding means"**

    **a.**    **"compressed data storing means"**

        **(claim 1 of the '992 patent)**

Pursuant to § 112, ¶ 6, the functions of the "compressed data storing means" inherent in the phrase "for storing as files" are (1) creating a file and (2) storing the file. The corresponding structure for creating and storing a file is the compressed data formatter 117. The claim element covers this corresponding structure and its equivalents. The corresponding structure for storage of the file is the compressed data library 118.[18] ('992 patent, figure 2a and 2b). The claim element covers this corresponding structure and its equivalents.

    **b.**    **"coupled to"**    **(claim 1 of the '992 patent)**

As explained above, the Court construes the phrase "coupled to" to have its plain and

---

[17] Similarly, transferring a diskette from one computer to another would not make the two computers "in data communication with" one another. *See '702 patent claims.*

[18] The Court does not address in this Order whether the specification of the '992 patent discloses sufficient structure for any term, in particular, the "compressed data formatter." *See Atmel*, 198 F.3d at 1382 (holding that Section 112, ¶ 6 "represents a quid pro quo by permitting inventors to use a generic means expression for a claim limitation provided that the specification indicates what structure(s) constitute(s) the means." "If our interpretation of the statute results in a slight amount of additional written description appearing in patent specifications compared with total omission of structure, that is the trade-off necessitated by an applicant's use of the statute's permissive generic means term.").

ordinary meaning, which is "directly connected to or attached to."

**B.     Claim 41 of The '992 Patent**

With the disputed terms and phrases in bold font, claim 41 of the '992 patent recites:

> 41. A method of transmitting information to **remote locations**, the transmission method comprising the steps, performed by a transmission system, of:
>
> **storing items having information in a source material library;**
>
> retrieving the information in the items from the source material library;
>
> assigning a **unique identification code** to the retrieved information;
>
> placing the retrieved information into a predetermined format as formatted data;
>
> **placing the formatted data into a sequence of addressable data blocks;**
>
> *compressing the formatted and sequenced data blocks;*
>
> **storing, as a file, the compressed, formatted, and sequenced data blocks with the assigned unique identification code;** and sending at least a portion of the file to one of the remote locations.

('992 patent, 24:53 - 25:5).

**1.     "storing items having information in a source material library"**

**(claim 41 of the '992 patent)**

The parties request that the Court construe the term "storing items having information in a source material library" that is an element in claim 41 of the '992 patent. Claim 41 in pertinent part recites: "[a] method of transmitting information to remote locations, the transmission method comprising the steps, performed by a transmission system, of: storing items having information in a source material library." ('992 patent, 24:54-56).

Acacia construes the phrase to mean "the act of placing items having information in a source material library for later use where a source material library is a place where source material is kept or a collection of such material, source material are physical things at the point of origin or procurement, items having information are units or members of groups which have

24

information, and information is any meaning assigned to data by known conventions." (Joint Claim Construction Chart, Docket Item No. 151). Acacia rebuts Defendants' assertion that the transmission system has readily accessible for use original source items of the transmission system in a library by citing the '992 patent, col. 18, lines 53-59, stating that act of retrieving the information for items is analogous to taking books off a shelf at the local public library.

Defendants construe "storing items having information in a source material library" to mean that "the transmission system has readily accessible for use (stores) original source items of the transmission system in a library," where library requires organization of the items. (Joint Claim Construction Chart, Docket Item No. 151). Defendants assert that Acacia initially required a library to be a collection of materials "arranged for ease of use" and that once Acacia abandoned its previous position Defendants added the phrase "organized collection."

The Court finds that the plain and ordinary meaning of the term "library" could mean either a collection of books or a place where books could be stored. The specification supports defining library to be a collection of original material, which contains analog or digital information, that the transmission system may convert, compress, and transmit. In other words, the specification defines the source material library as a collection of original sources of information. In the transmission system described in claim 41 of the '992 patent, the Court construes the phrase "storing items having information in a source material library" to mean "adding items having information to a collection of existing materials."

2.    **"storing, as a file, the compressed, formatted, and sequenced data blocks with the assigned unique identification code" (claim 41 of the '992 patent)**

As a preliminary matter, the disputed phrase "storing, as a file, the compressed, . . ." is not a step-plus-function claim element as asserted by defendants ITI and Offendale. The claim does not employ the "step for" language that signals the drafter's intent to invoke § 112, ¶ 6; rather the claim employs the phrase "A method . . . comprising the steps . . . of," which is an acceptable way to draft method claims. *See Masco Corp. v. United States*, 303 F.3d 1316, 1327 (Fed. Cir. 2002). "Courts must be cautious before adopting changes that disrupt the settled expectations of

the inventing community." *Id.* (citations omitted). Defendants ITI and Offendale have failed to overcome the presumption that claim 41 should not be construed as a step-plus-function claim.

The parties dispute the meaning of the term "with." Consistent with the Court's claim construction of the term unique identification code, the Court construes the term "with" to mean "accompanying or in the presence of" such that sequenced data blocks are accompanied by a corresponding unique identification code when stored. The Court construes the phrase "storing, as a file, the compressed, formatted, and sequenced data blocks with the assigned unique identification code" to mean "storing, as a file, the compressed, formatted, and sequenced data blocks accompanied by its unique identification code."

## C.    The '702 Patent

The '702 patent has 42 claims, three of which are independent claims -- 1, 17 and 27. Every claim of the '702 patent is directed toward a "communication system," which comprises both a transmission system and a reception system. Independent claim 1 with the font of the disputed terms and phrases in bold recites:

> 1. A communication system comprising:
>
> **a transmission system at a first location in data communication with a reception system at a second location,** wherein said transmission system comprises
>
> > **a sequence encoder,**
> >
> > **an identification encoder,** and
> >
> > a compressed data library in data communication with said **identification encoder,**
> >
> > wherein said **identification encoder** gives items in said compressed data library a unique identification code; and
> >
> > wherein said reception system comprises
> >
> > **a transceiver in data communication** with said transmission system,
>
> a storage device **in data communication** with said transceiver,
>
> user playback controls **in data communication** with said storage device,
>
> **a digital compressor in data communication** with said storage

device, and

a playback device **in data communication** with said digital decompressor.

('702 patent, 19:26-47).

### 1. "a transmission system at a first location in data communication with a reception system at a second location" (claims 1, 17 and 27 of the '702 patent)

Independent claims 1, 17, and 27 of the '702 patent all recite "a transmission system at a first location in data communication with a reception system at a second location." This claim limitation is made up of the following constituent phrases: "transmission system," "reception system," "in data communication with," "at a first location," and "at a second location." Each phrase will be addressed individually.

### a. "transmission system" (various claims of the '702 and '992 patents)

Acacia's proposed construction of the term "transmission system" is: "an assembly of elements, such as people, machines, and/or methods, capable of functioning together to transmit signals."[19] In support of its construction, Acacia relies on *IEEE Standard Dictionary of Electrical and Electronic Terms*, Fifth Ed. 1405 (1993) (hereinafter "IEEE Dictionary") that defines "transmission system" to mean "in communication practice, an assembly of elements capable of functioning together to transmit signal waves" and one of nineteen different definitions of the term "system" regarding software that recites "[a] collection of people, machines, and methods organized to accomplish a set of specific functions." (Plaintiff's Claim Construction Brief May 7, 2004 at 14).

Acacia contends that the specification supports its plain and ordinary meaning of the term "transmission system" that includes humans acting as system operators. *See* Plaintiff's Claim

---

[19] Plaintiff also contends that the "transmission system may be located in one facility or may be spread over a plurality of facilities." The Court will address Plaintiff's contention *infra* in connection with "at a first location" and "at a second location."

Construction Brief (May 7, 2004) at 14 (citing '702 patent, 8:29-32; 10:36-39; 10:59-63; and 14:13-26).

Defendants' proposed construction of the term "transmission system" is the *IEEE Dictionary* definition of the term that recites "as assembly of elements capable of functioning together to transmit signal waves," where Defendants contend that "signal waves" are "electric signals." (Defendants' Claim Construction Brief May 7, 2004 at 8) (citing Miller Decl., ex. NN at 575). Defendants contend that the Court need not define "elements" as used in the *IEEE Dictionary* definition of the term "transmission system" because the claims of the '702 patent state the elements that comprise a transmission system, and that list does not include a human operator. Also, Defendants assert that a human cannot be a part of a claim because a human is not patentable subject matter as defined by 35 U.S.C. § 101.[20]

The Court finds "transmission system" to mean "an assembly of elements, hardware and software, that function together to convert items of information for storage in a computer compatible form and subsequent transmission to a reception system."

### b. "reception system"

The parties' respective positions regarding "reception system" are reciprocal to their respective positions regarding "transmission systems." The term "reception system" does not appear in the specification. Plaintiff's proposed construction of a "reception system" is: "an assembly of elements, such as people, machines, and/or methods, capable of functioning together to receive signals." Whereas, the Defendants' proposed construction is "an assembly of elements that function together to receive electrical signals from the transmission system."

The Court construes "reception system" to mean "an assembly of elements, hardware and software, capable of functioning together to receive items of information."

---

[20] Title 35 U.S.C. § 101 (1952) recites that:
Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.

#### c. "in data communication with"

Acacia's proposed construction of the phrase "in data communication with" is one of two IEEE definitions of the term "data communication," which is "the movement of encoded information by means of communication techniques." *See* Plaintiff's Claim Construction Brief (May 7, 2004) at 17 (citing IEEE dictionary at 305, Block Decl., ex. 11).

Defendants' contend that the phrase "in data communication with" never appears in the specification. Relying on a IEEE dictionary definition, Defendants' contend that "in data communication with" should be construed to mean "connected to allow transfer of electrical signals."

The plain and ordinary meaning to one of ordinary skill in the art of the phrase "in data communication with" is "one or more devices connected such that data is being transferred between the devices in real-time." Acacia's proposed construction does not account for the words "in" and "with" that indicate two or possibly more devices are in real-time connection with one another.

A thorough review of the specification does not reveal the use of the phrase "in data communication with," although the phrase is used in every independent claim of the '702 patent. Thus, the specification does not rebut the plain and ordinary meaning, and neither does the prosecution history.

The Court construes "in data communication with" to mean "one or more devices connected such that data is being transferred between the devices in real-time."

#### d. "at a first location"

The issue is whether claims reciting "a transmission system at a first location" limit the system to being located at a particular location notwithstanding the disclosures in the specification and use of the word "comprising" in the claims. Case law from the United States Court of Appeals for the Federal Circuit supports a finding that articles "an" or "an" may mean "one or more than one" in particular instances, especially in claims that use the transitional term "comprising." *See Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 977 (Fed. Cir. 1999); *Abtox, Inc. v. Exitron Corp.*, 122 F.3d 1019, 1023 (Fed. Cir. 1997).

The claim language "at a first location" requires that "a transmission system" be limited to one particular location. Absent from all of Acacia's briefing regarding this disputed phrase is any mention of the preposition "at," which is used to indicate presence or position, "staying at a hotel" or "located at the mall." *See e.g. Webster's Ninth New Collegiate Dictionary* 111 (1991). The claim language supports limiting "a transmission system at a first location" to a transmission system being at one and only one particular location or premises.[21, 22] *See Ethico EndoSurgery, Inc. v. U.S. Surgical Corp.*, 93 F.3d 1572, 1582 (Fed. Cir. 1996); *Exxon Chemical Patents, Inc. v. Lubizol Corp.*, 64 F.3d 1553, 1557 (Fed. Cir. 1995) (recognizing that "[w]e must give meaning to all the words in Exxon's claims.").

The specification supports the phrase "a transmission system at a first location" enveloping one single transmission system at a single location. Figures 1a, 1b, 1d, 1e, 1f and 1g of the '702 patent illustrate a transmission system at a single location.[23] The specification does not rebut the plain and ordinary meaning of the claim, which is more limited in scope than the specification.

The prosecution history does not refute the plain and ordinary meaning of the phrase or

_____

[21] As Plaintiff asserts, the use of the terms "first" and "second" is a common patent law convention to distinguish between repeated instances of an element or limitation, but the Court does not consider use of the phrases "at a first location" and "at a second location" in the '702 patent to qualify as repeated instances of an element or limitation. *See* Plaintiff's Opposition to Defendants' Claim Construction Brief (May 13, 2004) (citing *3M Innovative Products Co. v. Avery Dennison Corp.*, 350 F.3d 1365, 1371 (Fed. Cir. 2003)).

[22] Relying on the prosecution history of U.S. Patent No. 6,002,720 ("the '720 patent"), a patent in the Yurt Family of Patents, which the '702 patent derives by way of a divisional application based upon the '720 patent, Defendants assert that term "location" should be construed to mean "premises." The term location is being applied in different context in that particular situation, and the Court elects not to rely on the prosecution history of a different patent, although the two patents share almost an identical specification, to construe the term location.

[23] As is often the case in the Yurt family of patents, the specification discloses a "high level block diagram" of the invention but does not explain the actual structural components (*e.g.* software or hardware) required to have a transmission system at more than one location. ('702 patent, 4:1). Thus, it is conceivable that the patentees limited the claim to not cover a transmission system in more than one location in an effort to preserve validity of the claims.

the way it is used in the claim language. In the Second Preliminary Amendment, the applicants

added new claims, without commentary, to the '702 patent application and the phrase appeared as

part of claims 33 (that issued as claim 1) and claim 50 (that issued as claim 27). ('702 Patent

Prosecution History, Miller Decl., ex. GG at 115-16).



### FIG. 1a

The Court construes "a transmission system at a first location" to mean "a transmission

system at one particular location separate from the location of the reception system."

#### e. "at a second location"

The Court construes "a reception system at a second location" to mean "a reception

system at one particular location separate from the location of the transmission system." ('702

patent, Fig. 1a). *See Andrew Corp. v. Gabriel Elec., Inc.*, 847 F.2d 819 (Fed. Cir. 1988) (holding

the a patentee may claim less than the entire invention).

#### 2. "sequence encoder" (claims 1, 7, 17 and 18 of the '702 patent)

Acacia contends that term "sequence encoder" as found in claims 1, 7, 17, and 18, does

not invoke 28 U.S.C. § 112, ¶ 6 because there is no use of the "means" in the claim, the term

connotes sufficient structure, and the term "encoder" is well-known to those skilled in the art of

electrical engineering, electronics, and computing. *See* Plaintiff's Claim Construction Brief (May

7, 2004) at 17. Acacia contends that an encoder is "a device or system that encodes data." *Id.*

(citing *IEEE Dictionary* at 437). Acacia asserts that a "sequence encoder" is "an encoder which

creates a sequence." *Id.* at 18.

The Court finds that 28 U.S.C. § 112, ¶ 6 does not apply to construction of the "sequence encoder" claim element. Therefore, from the intrinsic record, if possible, the court must determine the plain meaning, if any, that those of ordinary skill in the art would apply to the term.

The term "sequence encoder" has no plain meaning. Although the general term "encoder" does have a plain meaning, namely, an apparatus which encodes, such a general meaning is not useful in making a determination of the meaning of an apparatus called a "sequence encoder." At most it appears to take a nonspecific function–encoding a sequence–and claim an apparatus for performing that function. Since there is no plain meaning, the Court looks to the patent specification for defining the apparatus.

The term "sequence encoder" never appears in the specification of the '702 patent.

The legal consequence of claiming an apparatus which has no plain meaning and which is not defined or referred to in the specification is for the Court to declare the patent claim indefinite.

Acacia acknowledges that "sequence encoder" does not appear in the specification of the '702 patent. To avoid indefiniteness, Acacia asserts the description of a time encoder in the specification clarifies that the time encoder is a sequence encoder. *See* Acacia's Opposition to Defendants' Claim Construction Brief (May 13, 2004) at 15. Citing *Personalized Media Communications,* Plaintiff's contend that if the phrase "digital detector" in that case connotes sufficient structure to avoid application of § 112, ¶ 6, so does "sequence encoder."

Unlike the "digital detector" in *Personalized Media Communications,* that was at least functionally described in a block diagram, the term "sequence encoder" does not appear at all in the drawings or specification of the '702 patent.

With absolutely no reference or drawing , one of ordinary skill in the art would not know what a sequence encoder is, or what structure the encoder has, and how it interacts with other elements of the transmission system. Furthermore, a person skilled in the art would not find a time encoder that "places the blocks of converted formatted information from converter 113 into a group of addressable blocks" to be synonymous with a "sequence encoder." A time encoder that is described in dependant claim 7 of the '702 patent is a limitation describing an additional

32

function of the sequence encoder but does not assist one skilled in the art with defining the boundaries of the claimed element, "a sequence encoder." *See Ecolab, Inc. v. Paraclipse, Inc.,* 285 F.3d 1362, 1375 (Fed. Cir. 2002).

"As mandated by the definiteness requirement of 35 U.S.C. § 112, ¶ 2, a specification shall include claims 'particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention'" *Personalized Media Communications,* 161 F.3d at 705 (citing 35 U.S.C. § 112, ¶ 2). "Determining whether a claim is definite requires an analysis of 'whether one skilled in the art would understand the bounds of the claim when read in light of the specification.... If the claims read in light of the specification reasonably apprise those skilled in the art of the scope of the invention, § 112 demands no more.'" *Id.* (citing *Miles Lab., Inc. v. Shandon, Inc.,* 997 F.2d 870, 875 (Fed. Cir. 1993)).

Here, one of ordinary skill in the art would not be able to understand the bounds of the claim element, a sequence encoder, because the specification never mentions the term at all. The term "encoder" is a generic term to which the modifier "sequence" does not add clarity to one skilled in the art. The term "sequence encoder" not appearing at all in the specification distinguishes the case at hand from *Personalized Media Communications,* where the specification explicitly defined a "digital detector" as a device that "acts to detect the digital signal information" in another stream of information.[24] *Personalized Media Communications,* 161 F.3d at 706. Also, in *Personalized Media Communications,* the patentee asserted that the specification clearly apprises one of ordinary skill of the scope of the term. Acacia cannot suggest the general public is on notice of the scope of the term "sequence encoder" as the term never appears in the specification. Because the term "sequence encoder" does not appear in the specification of the claim, extrinsic evidence, such as expert testimony, may not be useful to the Court, as the intrinsic evidence appears unambiguous. *Id.* at 706 ("Extrinsic evidence may not be

---

[24] Also, in *Personalized Media,* the patentee asserted that the specification clearly apprises one of ordinary skill of the scope of the term. In the case at hand, Acacia cannot suggest the one of ordinary skill in the art is on notice of the scope of the term "sequence encoder" as the term never appears in the specification.

33

relied upon during claim construction when the intrinsic evidence unambiguously defines the disputed claim language.") (citing *Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.*, 132 F.3d 701, 706 (Fed. Cir. 1997). If the Court adopts this finding as its final conclusion on this matter, this would render claims 1, 7, 17, 18, 32 and 33 of U.S. Patent No. 6,144,702 indefinite.

The Court directs Acacia to file a motion for an evidentiary hearing and Defendants to file motions directed to, *inter alia*, the legal consequence that "sequence encoder" is indefinite.

> 3.  **"identification encoder"  (claims 1, 5, 6, 17, 19, 27 and 31 of the '702 patent)**

The parties dispute the meaning of the term "identification encoder" that is found in claims 1, 5, 6, 17, 19, 27 and 31 of the '702 patent.[25] Acacia contends that "*identification encoder*" should be construed to mean "a device or software capable of expressing the identification of an item in terms of code."

Defendants contend that "identification encoder" does not connote structure to one skilled in the art. Defendants' position is that the patentees use of the term "identification encoder" is functional claiming. In support of their position, Defendants cite to the prosecution history where the applicant's modified the identification encoder by requiring it to assign a unique identification code. Specifically, Defendants contend that the specification does not describe how the identification encoder assigns a unique identification code, a limitation added by the applicants to overcome a rejection in view of *Tindell*. (Defendants' Claim Construction Brief May 7, 2004 at 16). The applicants stated that the limitation was added too "more clearly define the **function** of the identification encoder." (Miller Decl., ex. KK at 165) (emphasis added).

Defendants assert that because "identification encoder" is a functional term, § 112, ¶ 6 applies. Defendants contend that there is no corresponding structure disclosed in the specification. (Defendants' Claim Construction Brief May 7, 2004 at 17). Because there is no

---

[25]Consideration of the term "identification encoder" for this patent is on a different legal footing than consideration of this same term as corresponding structure of a means-plus function claim in the '992 patent, since here there is no requirement that the Court first identify the function which the apparatus must perform and then look to the specification for corresponding structure which performs that function.

34

corresponding structure disclosed for the functional term, Defendants contend that the Court cannot construe the claim in accordance with § 112, ¶ 6 such that pursuant to § 112, ¶ 2 claims with the term "identification encoder" are invalid for indefiniteness. *Id.*

The Court finds that 28 U.S.C. § 112, ¶ 6 does not apply to construction of the "identification encoder" claim element.[26] Therefore, from the intrinsic record, if possible, the court must determine the plain meaning, if any, that those of ordinary skill in the art would apply to the term.

The term "identification encoder" has no plain meaning. Although the general term "encoder" does have a plain meaning, namely, an apparatus which encodes, such a general meaning is not useful in making a determination of the meaning of an apparatus called a "identification encoder." At most it appears to take a nonspecific function–encoding an identification–and claim an apparatus for performing that function. The five prior art patents cited by Acacia that disclose an identification encoder in five completely different ways, none of which are applicable here nor cited by the patents-in-suit, further exemplifies that one of skill in the art would not understand the meaning of the term "identification encoder." (Block Decl. ex. 24-28).

Since there is no plain meaning, the Court looks to the patent specification for defining the apparatus. Here, the specification of the '702 patent only discloses an identification encoder as a box that performs the function of assigning a unique identification code. ('702 patent, 6:30-39). The specification does not disclose an algorithm, software or apparatus to perform the function of assigning a unique identification code. Thus, one of ordinary skill in the art would not understand the scope or bounds of the claim, when it is read in light of the specification rendering an "identification encoder" insolubly ambiguous.

Although arguably indefinite, the Court construes "identification encoder" to mean "a

---

[26] The Court considers the term "identification encoder" to be indefinite consist with the Court's analysis of the term "identification encoding means." However, due to the rules of claim construction the Court does not believe it is appropriate to apply a means-plus-function analysis where the patentee has not chosen to raise the presumption by using the phrase "means for."

35

structure that assigns a unique identification code." The Court declines to address further the issue of indefiniteness during claim construction. The Court invites Defendants to file a motion for summary judgment pursuant to § 112, ¶ 1 and ¶ 2 regarding the term "identification encoder."

### 4.    "transceiver" (claims 1, 17 and 27)

The parties do not dispute that a "transceiver" is "a device capable of both sending and receiving information." However, the parties dispute whether that device must share circuit components. The *Dictionary of Computing*, 3rd ed. (1990), cited by both parties defines as a transceiver as follows:

> Acronym for transmitter and receiver. A device that can both transmit and receiver signal on a communication medium. Many communication devices, including *modems, *codecs, and terminals, are transceivers.

*Dictionary of Computing* 474 (3rd ed. 1990).

Defendants contend that examples of transceivers listed in the *Dictionary of Computing* are devices that perform two functions using shared circuitry; such as modems, an acronym for a device that is a modulator and demodulator; and codecs, an acronym for a device that is a coder and decoder.

In the specification, the description of a transceiver is at a block level that does not elaborate on the workings of the transceiver, much less its circuitry. The specification does illustrate the transceiver as a single box on figures 2b and 6 of the '702 patent.

The Court construes "transceiver" to mean "a singular device capable of both sending and receiving information."

### 5.    "wherein said identification encoder allows entry of a popularity code" (claims 6 and 27 of the '702 patent)

The disputed phrase "wherein said identification encoder allows entry of a popularity code" appears in claims 6 and 27 of the '702 patent. Acacia's proposed construction of the phrase is: "a popularity code is the symbols, letters, or words or combinations thereof used to represent the popularity of a particular item. The identification encoder allows entry of the popularity code." *See* Plaintiff's Claim Construction Brief at 28 (May 7, 2004).

Defendants contend that Acacia's definition is too broad. Defendants assert that the specification discloses a specific function in the transmission system "[t]he popularity code can be used to determine the most appropriate form of media storage of the compressed data in a mixed media system." (Defendants' Opposition to Plaintiff's Claim Construction May 13, 2004 at 18) (citing '702 patent, col 12, ll. 8-10). "In some cases, where multiple compressed data libraries 118 are organized, the popularity code may dictate the distribution of a particular item to multiple distribution systems." ('702 patent, 12:41-43).

"The storage encoding process performed by [the] identification encoder 112 allows entry of a popularity code." ('702 patent, 12:4-5). According to figure 2a, the "identification encoding process" occurs as the first step of converting material in a source material library into a format suitable for storage in a compressed data library and subsequent transmission. ('702 patent, fig. 2a). The specification indicates that the "popularity code is preferably assigned on the basis of how often the corresponding item is expected to be requested from the compressed data library 118." ('702 patent, 12:6-8).

The specification mentions that the popularity code may be updated by "factoring item usage against system usage." ('702 patent, 12:12-13). However, the specification does not disclose an algorithm, software program, or even a high level block diagram of how requests for a particular item (with copies possibly in other locations) is tracked by the popularity code and how the code is updated.

The specification does not disclose using a popularity code to retrieve items of information, but rather discloses the popularity code as a way of efficiently determining what storage media should be used for particular information to enhance retrieval. For example, how often an item of information is retrieved from the compressed data library determines whether the item is stored on cassette tapes (lower number of requests) or magneto-optical disks (highest number of requests). ('702 patent, 12:20-23). If a popularity code is assigned, the popularity code dictates distribution of a particular item to multiple distribution systems. ('702 patent, 12: 41-43).

Acacia contends that the term "popularity code" has a plain and ordinary meaning such that the Court need not look to the specification to define the term. While a term "popularity rating" connotes a meaning that it is a rating of how popular an item is, the same does not hold true for a "popularity code." Even if the term had a plain and ordinary meaning, which it does not, the patentees acted as their own lexicographers in assigning a specific meaning to the term in one of the few portions of the specification that are unambiguous.

As defined in the specification of the '702 patent, the popularity code, if assigned, has no function separate from the compressed data library. ('702 patent, 12:5-47). Accordingly, the Court construes "popularity code" to mean "a code that indicates initially the projected requests for an item of information in the compressed data library relative to other items contained therein for purposes of determining its place in the storage hierarchy; where said popularity code may be updated over time to reflect actual requests from users for particular information."

The Court construes "wherein said identification encoder allows entry of a popularity code" to mean "an identification encoder assigns an optional popularity code."[27]

**6.    "temporary storage device"   (claims 14 and 41 of the '702 patent)**

Acacia contends that "temporary storage device" should be construed to mean "a device into which data may be placed, retained for a limited time, and retrieved" or in accordance with the definitions cited by Defendants, "a storage device capable of storing data on an intermediate, or impermanent, basis."

Defendants contend that "[i]n the context of data transmission, one of skill in the art would understand that a temporary storage device is a device in which data may be stored on an

---

[27] During the prosecution of the '992 patent, the applicants disagreed with the examiner that *Lang* disclosed the recited "identification encoding means." The applicants explained that "the functions of the identification encoding means are to retrieve of [sic] information from the source material library means and to assign a unique identification code to the retrieved information." *Id.* Thus, in addition to retrieving information from a source material library means and assigning a unique identification code to the retrieved information, here said identification encoder must perform the additional step of assigning an optional popularity code.

impermanent basis." (Defendant's Response to Plaintiff's Claim Construction May 13, 2004 at 25).

The plain and ordinary meaning of the term "temporary storage device" is defined by the intent of the person storing the information, not whether data is stored on media that can be overwritten. The specification supports the plain meaning by explaining in Figure 6 that "[s]torage 203 allows for temporary storage of the requested item until playback is requested." ('702 patent, 17:37-38). The prosecution history does not rebut the plain and ordinary meaning. The Court construes "temporary storage device" to mean "a device intended to store data for an impermanent basis and allows for stored data to be retrieved from the storage device while the data resides therein."

### 7. "Digital Compressor" Should Be Rewritten to Read "Digital Decompressor" (claim 1 of the '702 patent)

The Patent and Trademark Office ("PTO") made a typographical error when formatting the '702 patent, such that the term "digital decompressor" appeared as "digital compressor" in claim 1. *See* '702 patent, col. 19, l. 44. Plaintiff's requested a certificate of correction to correct the PTO's mistake on December 12, 2002 and obtained a certificate of correction on April 15, 2003.

At the May 19, 2004 *Markman* Hearing, Defendants agreed that an error had occurred and that the term "compressor" should be "decompressor," but Defendants position is that the error is major such that the Court does not have the authority to change "compressor" to "decompressor." The result of the Court not correcting the PTO's mistake is that all lawsuits filed prior to issuance of the certificate of correction would be governed by claim 1 having the term "compressor" in the claim instead of the corrected term "decompressor."

After the enactment of 35 U.S.C. §§ 254 and 255, the Federal Circuit has allowed district courts to continue to correct obvious minor typographical and clerical errors in patents. *See Novo Indus., L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1357 (Fed. Cir. 2003); *Lemelson v. Gen. Mills, Inc.*, 968 F.2d 1202, 1203 & n. 3 (Fed. Cir.1992) (adding the word "toy" to the preamble of a claim because "[t]he deletion of 'toy' appears from the record of the proceedings before the PTO

to have been an inadvertent error when the patent was printed rather than an amendment to the claim").

"A district court can correct a patent only if (1) the correction is not subject to reasonable debate based on consideration of the claim language and the specification and (2) the prosecution history does not suggest a different interpretation of the claims." *Novo Indus.*, 350 F.3d at 1357. Here, the parties do not debate that a mistake was made such that the term "compressor" should be replaced with the term "decompressor." Also, the subject is not subject to reasonable debate because the reception system receives compressed data and then decompresses the data in a decompressor, not a compressor. The second element of the test is met because during the prosecution history, claim 1 consistently appears with the correct term "decompressor" and not "compressor," a mistake that did not occur until publication of the patent.

The Court construes "digital compressor" in claim 1 of the '702 patent to mean "digital decompressor." *See I.T.S. Rubber Co. v. Essex Rubber Co.*, 272 U.S. 429, 442 (1926).

## V.  CONCLUSION

To promote judicial economy, the parties should meet, confer and file with the Court no later than August 6, 2004, a joint statement that lists all now pending motions and any motions which the parties propose to file in light of the Court's *Markman* Order. The joint statement shall include each party's individual priority list of the order in which the Court should hear the listed motions and a concise (no more than one-page per party) explanation why the Court should adopt a particular party's proposed schedule.

The Court sets a telephonic case management conference ("CMC") for August 17, 2004 at 11:00 a.m. Plaintiff is to coordinate and initiate the CMC. After the CMC, the Court will set a schedule for briefing and hearing any motions.

Dated: July 12, 2004                          /s/ James Ware
                                              JAMES WARE
                                              United States District Judge

40