# EXHIBIT 1

1   HENNIGAN, BENNETT & DORMAN LLP
    RODERICK G. DORMAN (SBN 96908)
2   ALAN P. BLOCK (SBN 143783)
    KEVIN I. SHENKMAN (SBN 223315)
3   601 South Figueroa Street, Suite 3300
    Los Angeles, California 90017
4   Telephone: (213) 694-1200
    Facsimile: (213) 694-1234
5
    Attorneys for Plaintiff
6   ACACIA MEDIA TECHNOLOGIES CORPORATION

7

8                 UNITED STATES DISTRICT COURT

9                 CENTRAL DISTRICT OF CALIFORNIA

10                       SOUTHERN DIVISION

11

12  ACACIA MEDIA TECHNOLOGIES          Case No. SACV 02-1040 JW (MLGx)
    CORPORATION,
13                                     Consolidated Cases:
                                       SA CV 02-1048-JW (MLGx)
14                    Plaintiff,       SA CV 02-1063-JW (MLGx)
                                       SA CV 02-1165-JW (MLGx)
15          vs.                        SA CV 03-0217-JW (MLGx)
                                       SA CV 03-0218-JW (MLGx)
16  NEW DESTINY INTERNET GROUP,        SA CV 03-0219-JW (MLGx)
    et. al.,                           SA CV 03-0259-JW (MLGx)
17                                     SA CV 03-0271-JW (MLGx)
                      Defendants.      SA CV 03-0308-JW (MLGx)
18
                                       Related Cases:
19                                     SA CV 03-1610-JW (MLGX)
                                       SA CV 03-1800-JW (MLGX)
20                                     SA CV 03-1801-JW (MLGX)
                                       SA CV 03-1803-JW (MLGX)
21                                     SA CV 03-1804-JW (MLGX)
                                       SA CV 03-1805-JW (MLGX)
22                                     SA CV 03-1807-JW (MLGX)

23                                     PLAINTIFF ACACIA MEDIA
                                       TECHNOLOGIES
24                                     CORPORATION'S OPPOSITION
                                       TO DEFENDANTS' CLAIM
25                                     CONSTRUCTION BRIEF RE:
                                       CLAIM TERMS IN THE '702
26                                     PATENT

27  AND ALL RELATED CASE ACTIONS.      DATE:  May 19, 2004
                                       TIME:  9:00 a.m.
28                                     CTRM:  Hon. James Ware

# TABLE OF CONTENTS

(Page)

I.   INTRODUCTION ................................................................................. 1

II.  THE COURT SHOULD NOT ADOPT DEFENDANTS'
     PROPOSED CONSTRUCTIONS......................................................... 1

     A.   "A Transmission System At A First Location In Data
          Communication With A Reception System At A Second
          Location" ................................................................................. 1

               a)   The Article "A" in the Phrases "A First
                    Location" And "A Second Location" Is
                    Legally Construed To Mean "One Or More
                    Than One" ............................................................. 5

               b)   The Inventors Statements Made During
                    Prosecution Of The '720 Patent Regarding
                    "Premises" Have No Effect On The Claims Of
                    The '702 Patent..................................................... 6

          2.   Defendants' Proposed Construction Of "Data
               Communication" Is Erroneous, Because It Deviates
               From The Ordinary Meaning Of This Phrase.................... 7

     B.   Defendants' Indefiniteness Arguments Regarding The
          Terms "Sequence Encoder And "Identification Encoder"
          Fail As A Matter Of Law .......................................................... 9

          1.   The Terms "Sequence Encoder" And "Identification
               Encoder" Connote Structure............................................ 10

               a)   The Term "Encoder" is a Sufficient Recitation
                    of Structure to Avoid § 112, ¶ 6 ............................. 13

               b)   The Term "Identification Encoder" is Also
                    Sufficient Structure ............................................... 15

               c)   The term "Sequence Encoder" is Also
                    Sufficient Structure ............................................... 15

          2.   Defendants' Arguments That The Claim Terms Are
               Not Sufficient Structure Are Incorrect............................ 16

## TABLE OF CONTENTS (Con't)

a) Defendants Have Not Shown That The Term "Encoder" Does Not Connote Structure.................. 16

b) Defendants Have Not Shown That "Identification Encoder" Does Not Connote Structure ............................................. 17

c) Defendants Have Not Shown That "Sequence Encoder" Does Not Connote Structure .................. 18

3. Even If The Term "Identification Encoder" Is Construed Under § 112, ¶ 6, There Is Sufficient Structure In The Specification ........................................ 18

4. The Term "Sequence Encoder" Is Sufficiently Definite ......................................................................... 19

C. Defendants' Proposed Construction Of "Transceiver" Is Erroneous, Because It Relies On Dictionary Definitions That Are Inconsistent With And Not Supported By The Specification ....................................................................... 21

D. Defendants' Proposed Construction Of "Wherein Said Identification Encoder Allows Entry Of A Popularity Code" Is Erroneous, Because It Impermissibly Seeks To Import Limitations From The Specification ............................. 25

E. Defendants' Proposed Construction Of "Temporary Storage Device" Is Erroneous, Because It Deviates From The Ordinary Meaning Without Any Explanation Or Reason ...................................................................................... 28

F. Defendants Wrongly Argue That The Court Cannot Correct The Patent Office's Error In Printing Claim 1 Regarding The "Digital Decompressor" ...................................................... 29

G. Defendants' Proposed Construction For The "Ordering Means" Is Erroneous, Because Defendants Misconstrue The Claimed Function And Therefore Misinterpret The Time Encoder .......................................................................... 32

**TABLE OF CONTENTS (Con't)**

(Page)

1. The Time Encoder Performs The Function Of "Placing The Formatted Data Into A Sequence Of Addressable Data Blocks" By Assigning Relative Time Markers To The Blocks Of Formatted Information Received From The Converter 113 ............... 33

2. The Time Encoder Does Not Operate On A Mixed Series Of Audio/Video Data, As Defendants Contend ........................................................................ 35

3. The Construction Of "Coupled To" ................................ 37

III. CONCLUSION ........................................................................ 38

# TABLE OF AUTHORITIES

(Page)

**Cases**

3M Innovative Products Co. v. Avery Dennison Corp.,
350 F.3d 1365 (Fed. Cir. 2003)................................................. 6, 20

Abtox, Inc. v. Exitron Corp.,
122 F.3d 1019 (Fed. Cir. 1997)....................................................6

Atmel Corp. v. Information Storage Devices, Inc.,
198 F.3d 1374 (Fed. Cir. 1999).........................................10, 18, 20

Bancorp Services, L.L.C. v. Hartford Life Insurance Co.,
359 F.3d 1367 (Fed. Cir. March 1, 2004) .......................................20

Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.,
334 F.3d 1294 (Fed. Cir. 2003)....................................................22

CCS Fitness, Inc. v. Brunswick Corp.,
288 F.3d 1359 (Fed. Cir. 2002)................................................. 8, 23

Electro Medical Systems, S.A. v. Cooper Life Sciences, Inc.,
34 F.3d 1048 (Fed. Cir. 1994).....................................................25

Elkay Mfg. Co. v. Ebco Mfg. Co.,
192 F.3d 973 (Fed. Cir. 1999)......................................................5

Genentech, Inc. v. Chiron Corp.,
112 F.3d 495 (Fed. Cir. 1997)......................................................5

Greenberg v. Ethicon Endo-Surgery, Inc.,
91 F.3d 1580 (Fed. Cir. 1996)............................................... passim

Hybritech, Inc. v. Monoclonal Antibodies, Inc.,
802 F.2d 1367 (Fed. Cir. 1986)....................................................19

Inline Connection Corp. v. AOL Time Warner, Inc.,
302 F. Supp. 2d 307 (D. Del. 2004) .............................................24

Intellectual Property Development, Inc. v. UA-Columbia Cablevision of Westchester, Inc.,
336 F.3d 1308 (Fed. Cir. 2003).....................................................10

# TABLE OF AUTHORITIES (Con't)

(Page)

Masco Corp. v. U.S.,
   303 F.3d 1316 (Fed. Cir. 2002) .................................................................3

Medtronic, Inc. v. Advanced Cardiovascular Systems, Inc.,
   248 F.3d 1303 (Fed. Cir. 2001) ................................................................7

Multiform Dessicants, Inc. v. Medzam, Ltd.,
   133 F.3d 1473 (Fed. Cir. 1998) ..............................................................20

North American Vaccine, Inc. v. American Cyanamid Co.,
   7 F.3d 1571 (Fed. Cir. 1993) ....................................................................6

Novo Industries, L.P. v. Micro Molds Corp.,
   350 F.3d 1348 (Fed. Cir. 2003) ..............................................................31

Personalized Media Communications, L.L.C. v. International Trade Commission,
   161 F.3d 696 (Fed. Cir. 1998) ......................................................... passim

Rexnord Corp. v. The Laitram Corp.,
   274 F.3d 1336 (Fed. Cir. 2001) ........................................................ 2, 23

S3, Inc. v. Nvidia Corp.,
   259 F.3d 1364 (Fed. Cir. 2001) ..............................................................19

Texas Digital Systems, Inc. v. Telegenix, Inc.,
   308 F.3d 1193 (Fed. Cir. 2002) ...................................................3, 22, 23

Toro Co. v. White Consolidated Industries, Inc.,
   199 F.3d 1295 (Fed. Cir. 1999) ..............................................................20

Vitronics Corp. v. Conceptronic, Inc.,
   90 F.3d 1576 n 6 (Fed. Cir. 1996) ..........................................................23

Wang Laboratories, Inc. v. America Online, Inc.,
   197 F.3d 1377 (Fed. Cir. 1999) ..............................................................20

## Other Authorities

35 U.S.C. § 112 .............................................................................. passim

# I.  INTRODUCTION

Acacia hereby provides its opposition to defendants' proposed claim constructions for the terms in the '702 patent.

Defendants' proposed claim constructions are erroneous for many reasons—too many to fully address in this introduction. Most notable of defendants' errors relates to the terms "identification encoder" and "sequence encoder." These terms connote structure, as a matter of law, and therefore these terms are not construed as means-plus-function claims. This cannot be disputed. The Federal Circuit in <u>Personalized Media</u> (a case relied on by defendants) held that a very similar claim term—"digital detector"—connotes structure and therefore that claim term cannot be construed as a means-plus-function term. <u>Personalized Media</u> supports Acacia's position. Defendants have not met their burden of proving invalidity of the claims of the '702 patent by clear and convincing evidence.

Each of defendants' proposed constructions invite the Court to commit legal error. The Court should not accept defendants' invitation; it should adopt the constructions proposed by Acacia in its briefs.

# II.  THE COURT SHOULD NOT ADOPT DEFENDANTS' PROPOSED CONSTRUCTIONS

## A.  "A Transmission System At A First Location In Data Communication With A Reception System At A Second Location"

Acacia construes this phrase as:

at least one transmission system, i.e., an assembly of elements, such as people, machines, and/or methods, capable of functioning together to transmit signals wherein the transmission system may be located at one facility or may be spread over a plurality of facilities, and at least one reception system, i.e., an assembly of elements, such as people, machines, and/or methods, capable of functioning together to receive signals, wherein the transmission

-1-

system(s) and reception system(s) are at different locations and
wherein encoded information may move between the transmission
and reception system(s) by means of communication techniques.

Defendants construe this phrase as: "an assembly of elements, located at a single first premises, that function together to transmit electrical signals to an assembly of elements, located at a second single premises, that function together to receive the transmitted electrical signals, when the transmitting assembly of elements and the receiving assembly of elements are connected so that electrical signals may be transferred between them." Acacia has set forth below each instance where Acacia and Defendants disagree as to terms within this phrase, and explain why Acacia's proffered construction is the legally correct construction.

**1.    The word "system" should be construed as "an assembly of elements, such as people, machines, and/or methods," and not simply as "an assembly of elements."**

Although both Acacia and Defendants construe "systems" as an "assembly of elements," the inclusive meaning of "elements," consistent with the patent specification and relevant dictionary definitions should be used. Without explaining in a jury instruction that system "elements" can include "people, machines, and/or methods," Acacia justifiably fears that its patent claims will not be construed to the full scope of its invention.

The Federal Circuit requires that courts give a claim term the full range of its ordinary meaning. Rexnord Corp. v. The Laitram Corp., 274 F.3d 1336, 1342 (Fed. Cir. 2001) ("In addition, unless compelled to do otherwise, a court will give a claim term the full range of its ordinary meaning as understood by an artisan of ordinary skill.") Here, the full range of the ordinary meaning of the phrase "transmission system" and "reception system" includes the fact that the elements of the system may include people, machines, and methods. This ordinary meaning is found in the IEEE Dictionary in the definition of the term "system." It should be included together with

1  the IEEE Dictionary definition of "transmission system." Texas Digital Systems, Inc.

2  v. Telegenix, Inc., 308 F.3d 1193, 1203 (Fed. Cir. 2002) ("If more than one dictionary

3  definition is consistent with the use of the words in the intrinsic record, the claim

4  terms may be construed to encompass all such consistent meanings.")

5      The fact that the transmission system (and the reception system, which in the

6  context of this claim phrase is the reciprocal of the transmission system[1]) may include

7  people, machines, and methods in the system is consistent with the specification of

8  the '702 patent. ('702 patent, 8:29-32; 10:36-39; 10:59-63; and 14:13-26).

9      **2.**     **The phrase "a transmission system at a first location" should**

10             **be construed as a transmission system located at one facility or**

11             **a plurality of facilities, not located "at a single, first premises,"**

12             **as Defendants contend.**

13     The '702 patent specification states that the transmission system may either be

14 located in one facility or may be spread over a plurality of facilities. ('702 patent,

15 5:58-60). This feature of the transmission system should be included in the

16 construction of the phrase "transmission system," because it is the system that is

17 described by the inventors in the '702 patent. If the Court were not to include the fact

18 that the transmission system may be located in more than one facility, then the

19 construction could be interpreted exclude transmission systems located in multiple

20 facilities. Such a construction would be improper, because it would be inconsistent

21 with the inventors' disclosure of the transmission system in the '702 patent. Masco

22 Corp. v. U.S., 303 F.3d 1316, 1325 (Fed. Cir. 2002) ("Masco's proposed definition of

23 'drive' to encompass pulling actions is inconsistent with the specification of the '068

24 patent and with the prosecution history of the '068 patent and its parent patent.")

25 Defendants' improperly ignore this described feature of the transmission system in

26 their construction of the phrase "transmission system."

27

28      [1] Defendants state that the reception system is the reciprocal of the transmission
    system. (Defendants' Opening Brief at 9:2-4).

1   The claim language, even though it states "a transmission system at a first
2   location," is consistent with a single location being geographically broad enough to
3   encompass a plurality of facilities.  It is clear from the context of the words of claims
4   1, 17 and 27 that the limitation "at a first location" is used in contradiction to the
5   "reception system at a second location."  So long as no elements of the transmission
6   system are at the location of the reception system, the location elements of the claim
7   would be met.
8       The arguments asserted by Defendants for a contrary construction rely on two
9   incorrect legal arguments:  (1) that the terms "a first location" and "a second location"
10  "must be construed to mean a single location" (Defendants' Opening Brief at 10:28-
11  11:1); and (2) that the inventors intended the term "location" to mean a "premises,"
12  because they had made such a statement in a prior related patent.  Because neither
13  argument is correct, defendants' proposed construction must fail.
14      Notably, Defendants' legal arguments in its opening brief are contradicted by
15  their original construction of "a first location" and "a second location" in their
16  discovery responses.  In their discovery responses, defendants did not contend that the
17  first and second locations each means a single location, nor did they contend that the
18  term "location" means a premises, rather than location.  Instead, defendants contended
19  that "[t]he transmission system and the reception system must be at different
20  locations."  (Exhibit 13 at p. 124 to Block Decl.)  Acacia agreed with this
21  construction, and therefore Acacia adopted defendants' construction in its
22  supplemental claim constructions, which the parties exchanged on May 4, 2004, and
23  in its claim construction brief.[2]  (Exhibit 15 to Block Decl.).
24

25      [2] Acacia's original construction, which defendants had in their possession when
    defendants made their original construction, was very similar to defendants' original
26  construction.  Acacia contended that the first and second locations were not absolute
    locations, but rather locations that were relative to one another.  Thus, the term "first
27  location" means anywhere other than the second location and the term "second
    location" means anywhere other than the first location. (Exhibit 22 to Block Supp.
28  Decl.)

### a) The Article "A" in the Phrases "A First Location" And "A Second Location" Is Legally Construed To Mean "One Or More Than One"

Defendants' contention that the terms "a first location" and "a second location" each "must be construed to mean a single location" is incorrect as a matter of law. This construction is inconsistent with the specification of the '702 patent, which states that the transmission system may be located in one or more facilities. ('702 patent, 5:57-60).

All of the claims of the '702 patent use the open ended transitional term "comprising"[3] in its preamble:

> "1. A communication system comprising:
>
> a transmission system at a first location in data communication with a reception system at a second location."

(Claim 1 of the '702 patent; emphasis added).

The Federal Circuit has held that, the articles "a" or "an" mean "one or more than one," in claims which use the open ended transitional term "comprising." Elkay Mfg. Co. v. Ebco Mfg. Co., 192 F.3d 973, 977 (Fed. Cir. 1999) ("While the article 'a' or 'an' may suggest 'one,' our cases emphasize that 'a' or 'an' can mean 'one' or 'more than one,' depending on the context in which the article is used.... The asserted claims, however, use the open term 'comprising' in their transition phrases. We therefore hold that the plain meaning of 'an upstanding feed tube ... to provide a hygienic flow path for delivering liquid from ... and for admitting air ... into said container' is not necessarily limited to a single feed tube with a single flow path for both liquid and air."); Abtox, Inc. v. Exitron Corp., 122 F.3d 1019, 1023 (Fed. Cir.

---

[3] The transitional term "comprising" is a term of art used in claim language which means that the named elements are essential, but other elements may be added and still form a construct within the scope of the claim. Genentech, Inc. v. Chiron Corp., 112 F.3d 495, 501 (Fed. Cir. 1997).

1997) ("The article 'a' suggests a single chamber. However, patent claim parlance also recognizes that an article can carry the meaning of 'one or more,' for example in a claim using the transitional phrase 'comprising.'") citing, North American Vaccine, Inc. v. American Cyanamid Co., 7 F.3d 1571, 1575-76 (Fed. Cir. 1993).

Here, because the claims use the transitional phrase "comprising" and because the article "a" appears in the phrases "a first location" and "a second location," these phrases must be construed to mean: "one or more than one first location" and "one or more than one second location."[4]

Defendants are therefore wrong to argue that these phrases "must be construed to mean a single location." This proposition is not supported by Federal Circuit law under the facts of this case. Defendants cite no case which supports its position and there is clear, controlling Federal Circuit precedent to the contrary.

Thus, the phrases "a first location" and "a second location" are construed to mean "one or more first location" and "one or more second location."

### b) The Inventors Statements Made During Prosecution Of The '720 Patent Regarding "Premises" Have No Effect On The Claims Of The '702 Patent

Defendants discuss the prosecution history of the related U.S. Patent No. 6,002,720 (the '720 patent) and argue that the term "location" in the claims of the '702 patent must be interpreted to mean "premises." Defendants fail to inform the Court that the claims that were at issue in the '720 patent claimed a different system. The term "location" used in the claims of the '720 patent during its prosecution does not refer to the location of the transmission system or the reception system. Rather it refers to the location selected by the user who is accessing the system, to which the information is to be delivered.

---

[4] See, 3M Innovative Products Co. v. Avery Dennison Corp., 350 F.3d 1365, 1371 (Fed. Cir. 2003) ("The use of the terms 'first' and 'second' is a common patent-law convention to distinguish between repeated instances of an element or limitation.").

The discussion of the term "location" in the '720 patent file history related only to pending claims 43 and 44. (See, Exhibit HH at pp. 435; 439-440 to Miller Decl.). Claim 43 states: "[a] transmission system responsive to input from a user positioned at an accessing location for transmitting information to premises selected by the user, the transmission system comprising ..." The discussion of the prior art and the statement by the inventors relating to locations and premises related to the place to which information will be transmitted when that place may be other than the place where the user accesses or requests the information. (Exhibit HH at pp. 435; 439-440 to Miller Decl.). Because the '720 patent refers to a different claim limitation (position of a user accessing the transmission system) than that which is being construed in the '702 patent (locations of the transmission and reception system), the Court cannot consider this portion of the '720 patent file history in construing terms in different limitations in the '702 patent claims. See, Medtronic, Inc. v. Advanced Cardiovascular Systems, Inc., 248 F.3d 1303, 1315 (Fed. Cir. 2001) ("However, none of the claims of the '732 patent contain the same limitation that we are construing from the '727 patent. Accordingly, we decline Medtronic's invitation to consider the '732 patent's prosecution history for the purpose of construing the limitation in question.")

The Court should therefore not construe the term "location" to be "premises."

**3.    Defendants' Proposed Construction Of "Data Communication" Is Erroneous, Because It Deviates From The Ordinary Meaning Of This Phrase**

Defendants' proposed construction of "data communication" is erroneous, because it is not the ordinary meaning of the phrase and there is no basis in the specification for deviating from the ordinary meaning.

In their brief, defendants note that the IEEE Dictionary provide two definitions for data communication: (1) the movement of encoded information by means of communication techniques; and (2) a data transfer between data source and data

destination via one or more data links. (Defendants' Opening Brief at 9:17-22). In their discovery responses Defendants had embraced the first IEEE Dictionary definition, but now Defendants dismissively argue that "the definitions are not particularly useful."[5] Instead, defendants contrive their own definition, a definition which defendants do not support with a dictionary, or with the specification or file history of the '702 patent. That defendants seemingly find their own fanciful definition, apparently totally imagined by defendants, more "useful" provides no basis whatsoever for adopting defendants construction.

There is a heavy presumption that claim terms take on their ordinary meaning. CCS Fitness, Inc. v. Brunswick Corp., 288 F.3d 1359, 1366 (Fed. Cir. 2002). Defendants cannot overcome this heavy presumption with cavalier statements that the ordinary meaning is "not particularly useful." Defendants have not justified their deviation from the ordinary meaning of data communication as set forth in the IEEE Dictionary and which they originally embraced.

Thus, the phrase "data communication" is construed consistent with its ordinary meaning to mean "the movement of encoded information by means of communications techniques."

_____

[5] In their original discovery responses, defendants proposed that "data communication" be construed in accordance with the first definition in the IEEE Dictionary as "the movement of encoded information by means of communications techniques." (Exhibit 11 at p. 101 to Block Decl.). For the majority of this case, defendants found the IEEE Dictionary definition to be satisfactory. This was even after defendants were able to consider Acacia's construction, which included the two IEEE Dictionary definitions now abandoned by defendants.

The parties agreed to supplement their discovery constructions by exchanging supplemental constructions on May 4, 2004. In reliance on defendants' construction of "data communications" and in an effort to reduce the number of disputes between the parties over the construction of claim terms, Acacia supplemented its construction of "data communication" by adopting the construction proposed by defendants. (Exhibit 15 to Block Decl.). Meanwhile, at the same time, defendants changed their construction to deviate from the ordinary meaning they originally embraced to a new, unsupported definition.

### B. Defendants' Indefiniteness Arguments Regarding The Terms "Sequence Encoder And "Identification Encoder" Fail As A Matter Of Law

Defendants' contend that the terms "sequence encoder" and "identification encoder" are indefinite under 35 U.S.C. § 112, ¶ 2. Defendants argue that these terms are both "functional" terms and therefore do not connote any structure. As a result, according to defendants, the "identification encoder" term should be construed as means-plus-function claim terms under 35 U.S.C. § 112, ¶ 6. Defendants argue that the specification does not contain sufficient corresponding structure for the "identification encoder," making the identification encoder term indefinite.

With respect to "sequence encoder," defendants, in a lengthy discussion of prior art references, conclude that no function for the "functional" term "sequence encoder" is recited in claims 1 and 17, and therefore § 112, ¶ 6 does not apply to the "sequence encoder" term. Nevertheless, without explanation, defendants conclude that the "sequence encoder" term is also indefinite.

Defendants' arguments are without merit. Defendants' reliance on Personalized Media Communications, L.L.C. v. International Trade Commission, 161 F.3d 696 (Fed. Cir. 1998) is misplaced. As discussed below, Personalized Media held that a claim term very similar to the terms at issue here—"digital detector"—comprised structure and therefore, as a matter of law, could not be construed as a means-plus-function claim term. The Federal Circuit also held the term to be definite. Rather than supporting defendants' position, Personalized Media actually supports Acacia's position that these terms themselves connote sufficient structure. The Federal Circuit's decision in Greenberg v. Ethicon Endo-Surgery, Inc., 91 F.3d 1580 (Fed. Cir. 1996) is also on point, because, in that case, the court held that even claim terms defined in functional terms are sufficient structure to avoid application of § 112, ¶ 6.

In considering these indefiniteness issues, the Court must be mindful that defendants are seeking to invalidate the claims of the '702 patent. The claims of the '702 patent are presumed valid and defendants can only overcome this presumption with clear and convincing evidence, which they have not done. <u>Intellectual Property Development, Inc. v. UA-Columbia Cablevision of Westchester, Inc.</u>, 336 F.3d 1308, 1319 (Fed. Cir. 2003).

Further, the issue of indefiniteness is determined by what is understood by persons skilled in the art when reading the claims in light of the specification. <u>Atmel Corp. v. Information Storage Devices, Inc.</u>, 198 F.3d 1374, 1378 (Fed. Cir. 1999). Defendants ignore this standard in their brief, and, in fact, attempt to mislead the Court by arguing that "whether or not defendants present testimony from an expert in claim construction issues has no bearing on the Court's ability to make the legal determination of whether a claim satisfies § 112, ¶ 2 by providing sufficient structure." (Defendants' Opening Brief, at 6:27 - 7:1). Defendants invite legal error by instructing the Court to determine issues of indefiniteness without even considering expert testimony. <u>Atmel</u>, 198 F.3d at 1380 (court erred by failing to assess indefiniteness based on the understanding of one skilled in the art.)

### 1. The Terms "Sequence Encoder" And "Identification Encoder" Connote Structure

The Federal Circuit in <u>Personalized Media</u> held a claim term, "digital detector," is sufficient structure to avoid § 112, ¶ 6 treatment. The claim term was held to be definite.

In <u>Personalized Media</u>, the Administrative Law Judge ("ALJ") (this case was on appeal from the International Trade Commission) held that the "digital detector"[6]

---

[6] In the claims at issue in <u>Personalized Media</u>, the phrases were: (1) "a digital detector for receiving said transmission and detecting said predetermined signal in said transmission based on either a specific location or a specific time;" and (2) "a digital detector for receiving at least some information of said transmission and detecting said specific signal at a specific location or time." <u>Personalized Media</u>, 161 F.3d at 698-99.

in the claims was construed as a means-plus-function claim term under § 112, ¶ 6 and found that the specification lacked a specific structure for the digital detector, because the specification described the digital detector in functional terms. <u>Personalized Media</u>, 161 F.3d at 700. The ALJ thus held the term "digital detector" to be indefinite and thus held the claims to be indefinite. <u>Id.</u> at 700-01.

The Federal Circuit reversed the ALJ, finding that the term "digital detector" communicates sufficient structure. The court only had to look to dictionary definitions of "detector" to determine that the term "detector" had a well-know meaning as being structure to those of skill in the electrical arts:

> The "digital detector" limitation does not use the word "means,"
> and therefore this limitation is presumed not to invoke § 112, ¶ 6.
> Neither intrinsic nor extrinsic evidence rebuts this presumption
> because the term "detector" is a sufficient recitation of structure.
> "Detector" is not a generic structural term such as "means,"
> "element," or "device"; nor is it a coined term lacking a clear
> meaning, such as "widget" or "ram-a-fram." Instead, as noted by
> the ALJ by reference to dictionary definitions, "detector" had a
> well-known meaning to those of skill in the electrical arts
> connotative of structure, including a rectifier or demodulator. No
> other extrinsic evidence, including the expert testimony, and no
> evidence intrinsic to the patent casts doubt on this conclusion.

<u>Personalized Media</u>, 161 F.3d at 704-705. The court discussed the fact that the ALJ's analysis centered around the ambiguity raised by the phrase "digital detector." <u>Personalized Media</u>, 161 F.3d at 705. The Federal Circuit found no ambiguity caused by this phrase, and in fact found that the term "digital" further narrowed the scope of detectors and made the term even more definite:

However, an adjectival qualification ("digital") placed upon
otherwise sufficiently definite structure ("detector") does not make
the sufficiency of that structure any less sufficient for purposes of
§ 112, P 6. Instead, it further narrows the scope of those structures
covered by the claim and makes the term more definite. The use of
the word "digital" in conjunction with the word "detector" merely
places an additional functional constraint (extraction of digital
information) on a structure (detector) otherwise adequately
defined.

Personalized Media, 161 F.3d at 705.

Having determined that the term "digital detector" is not construed under § 112,
¶ 6, the court next considered whether the term was indefinite. The court found that
the term "digital detector" was definite, because the specification of the patent
sufficiently defines the "digital detector" as a device. Personalized Media, 161 F.3d
at 705-706 ("Here, the written description of the specification is sufficient to inform
one skilled in the art of the meaning of the claim language "digital detector." It
explicitly defines a "digital detector" as a device that "acts to detect the digital signal
information" in another stream of information.)

The Greenberg case is also on point. In Greenberg, the claim language was
"detent mechanism defining cojoint rotation of said shafts." The court found that,
although the particular mechanism—"detent mechanism"—was defined in functional
terms, this was insufficient to convert that claim element into a means-plus-function
claim term. Greenberg, 91 F.3d at 1583. The court discussed the fact that, although
many devices take their names from the functions that they perform, this is
insufficient to "convert a claim element containing such a term" to a means-plus-
function claim term:

First, the fact that a particular mechanism—here "detent
mechanism"—is defined in functional terms is not sufficient to

convert a claim element containing that term into a "means for performing a specified function" within the meaning of section 112(6). Many devices take their names from the functions they perform. The examples are innumerable, such as "filter," "brake," "clamp," "screwdriver," or "lock." Indeed, several of the devices at issue in this case have names that describe their functions, such as "graspers," "cutters," and "suture applicators." "Detent" (or its equivalent, "detent mechanism") is just such a term. Dictionary definitions make clear that the noun "detent" denotes a type of device with a generally understood meaning in the mechanical arts, even though the definitions are expressed in functional terms.

<u>Greenberg</u>, 91 F.3d at 1583.

In <u>Greenberg,</u> it was not important that the term "detent" does not call to mind a single well-defined structure. It was enough that the term, as a name for a structure, has a reasonably well understood meaning in the art. <u>Greenberg</u>, 91 F.3d at 1583; <u>Personalized Media</u>, 161 F.3d at 705-06 ("Even though the term "detector" does not specifically evoke a particular structure, it does convey to one knowledgeable in the art a variety of structures known as 'detectors.'")

### a) The Term "Encoder" is a Sufficient Recitation of Structure to Avoid § 112, ¶ 6

The claim terms at issue here are "identification encoder" and "sequence encoder." Both claim terms use the word "encoder." The term "means for" is not used. There is thus a presumption that § 112, ¶ 6 does not apply to these claim terms.

The term "encoder" has a well-known meaning to persons of skill in the art as connoting structure.

"Encoder" is defined in the <u>IEEE Dictionary</u>, Fifth Edition as structure: "1. a network or system in which only one input is excited at a time and each input

produces a combination of outputs; 2. a device that performs encoding; 3. a device or system that encodes data." (Exhibit 11 at p. 103 to Block Decl.).

"Encoder" is defined in the <u>McGraw-Hill Electronics Dictionary</u>, Fifth Edition (1994) as structure: "2. A circuit that performs repeated sampling, compression, and analog-to-digital conversion to convert an analog signal to a serial stream of pulse-code modulated (PCM) samples representing the analog signal." (Exhibit 23 to Block Supp. Decl.).

"Encoder" is defined in the <u>Dictionary of Computing</u>, Third Edition (1990) as structure: "1. the means by which an encoding process is effected (see code). It may be implemented in hardware or software, the process being algorithmic in nature; 2. a logic circuit, usually an integrated circuit, that generates a unique n-bit binary word, indicating which of its $2^n$ input lines is active, i.e., at logic 1. A keyboard encoder, for example, may be required to generate a unique binary code indicating which key on the keyboard has been pressed. If two or more of the device inputs can be active simultaneously then a priority encoder is required, which usually encodes only the highest-order data input."

Thus, the term "encoder" has a well-known meaning to those of skill in the art as connoting structure—encoders are defined in dictionaries as being embodied in a network, a system, a device, a circuit, hardware, software, a logic circuit, an integrated circuit, or a keyboard. <u>See</u>, <u>Personalized Media</u>, 161 F.3d at 704-05.

The fact that the term "encoder" may be defined in terms of its function is insufficient to show that the term "encoder" does not connote structure. <u>See</u>, <u>Greenberg</u>, 91 F.3d at 1583 ("Many devices take their name from the functions they perform.... Dictionary definitions make clear that the noun 'detent' denotes a type of device with a generally understood meaning in the mechanical arts, even though the definitions are expressed in functional terms."); <u>Personalized Media</u>, 161 F.3d at 705 ("Even though the term 'detector' does not specifically evoke a particular structure, it

does convey to one knowledgeable in the art a variety of structures known as 'detectors.'")

### b) The Term "Identification Encoder" is Also Sufficient Structure

Like the word "digital" in the "digital detector" in <u>Personalized Media</u>, the word "identification" in "identification encoder" is an adjectival qualification placed on otherwise sufficiently definite structure. The specification describes the "identification encoder" as an encoder which "gives a unique identification code to an item." ('702 patent, 6:31-35). The identification encoder also optionally logs details about the item (program notes), assigns the item a popularity code, maps item addresses to item names, and operates a program which updates a master item database. ('702 patent, 6:34-39; 10:45-46; 10:52-58; 12:4-5). See, <u>Personalized Media</u>, 161 F.3d at 705-06 ("Here, the written description of the specification is sufficient to inform one skilled in the art of the meaning of the claim language 'digital detector.' It explicitly defines a 'digital detector' as a device that 'acts to detect the digital signal information' in another stream of information.")

### c) The term "Sequence Encoder" is Also Sufficient Structure

Although the term "sequence encoder" is not used in the specification of the '702 patent, the specification of the '702 patent is also sufficient to inform persons of skill in the art of the meaning of the term "sequence encoder" as structure. The specification discloses a time encoder, which functions to place blocks of converted format information from converter 113 into a group or sequence of addressable data blocks by assigning relative time markers to data prior to subsequent compression. ('702 patent, 7:57-59; 8:6-9; 8:46-49; Fig. 2a). From this description in the specification, it is clear that the time encoder is a sequence encoder. Defendants

1  admit that the time encoder disclosed in the specification is sufficient structure.[7]

2  (Defendants' Opening Brief at 29:17-20).

3      Thus, the terms "sequence encoder" and "identification encoder" connote

4  sufficient structure, and the presumption that § 112, ¶ 6 does not apply cannot be

5  overcome. These claim terms are therefore not construed pursuant to § 112, ¶ 6 and

6  the Court does not have to determine whether the specification discloses sufficient

7  structure.

8      **2.      Defendants' Arguments That The Claim Terms Are Not**

9             **Sufficient Structure Are Incorrect**

10            **a)      Defendants Have Not Shown That The Term "Encoder"**

11                   **Does Not Connote Structure**

12     Defendants recite the definitions for "encoder" from the IEEE Dictionary, and

13  argue that, because these definitions use the terms "device" and "system," the term

14  "encoder" is "purely functional." (Defendants' Opening Brief at 15:1-8). It is

15  irrelevant that the definition of the term "encoder" includes terms, such as "device"

16  and "system," because those terms (device or system or the like) do not appear in the

17  claims of the '702 patent. The claim term is "encoder;" not "device" or "system."

18     Regardless, even if "encoder" is defined in functional terms, this is insufficient

19  to convert the claim term into a means-plus-function term. As shown by the

20  dictionary definitions, the term "encoder" is a type of device that is generally

21

22

---

23     [7]  Defendants' positions in their brief as to whether the disclosure in the
    specification is sufficient to connote structure are at odds. On the one hand,
24  defendants contend that the time encoder is sufficient structure but, on the other hand
    contend that the identification encoder, as described in the specification, is not
25  sufficient structure. The specification describes the identification encoder in at least
    as much detail as the time encoder and both are described in as least as much detail as
26  was the "digital detector" in Personalized Media. See, Personalized Media, 161 F.3d
    at 705-06 ("Here, the written description of the specification is sufficient to inform
27  one skilled in the art of the meaning of the claim language 'digital detector.' It
    explicitly defines a 'digital detector' as a device that 'acts to detect the digital signal
28  information' in another stream of information.").

1  understood in the field of computers, communications, and electronics to be structure.

2  See, Greenberg, 91 F.3d at 1583.

3  The term "encoder" connotes structure.

4  **b)  Defendants Have Not Shown That "Identification**

5  **Encoder" Does Not Connote Structure**

6  Defendants contend that the term "identification encoder" does not connote

7  structure. Defendants argue, without any support, that "[t]he term 'identification

8  encoder' does not have any meaning to those of skill in the art that connotes

9  structure." (Defendants' Opening Brief at 14:1-2).

10  This statement is untrue. The term "identification encoder" has meaning to

11  those of skill in the art which connotes structure. Many United States patents disclose

12  structures called "identification encoders." (Exhibits 24-27 to Block Supp. Decl.).[8]

13  Defendants argue that such patents "employ the term 'identification encoder' in a

14  purely functional fashion to encompass whatever structure is disclosed in the

15  particular patent." (Defendants' Opening Brief at 14:14-17). In other words, the term

16  "identification encoder" is used in these patents to connote structure. Thus, even

17  according to defendants, those of skill in the art use the phrase "identification

18  encoder" to connote structure.

19  Defendants further argue that a statement by the inventors during the

20  prosecution of the '702 patent, when amending claim 1, somehow means that the

21  identification encoder has a function, but no structure. (Defendants' Opening Brief at

22  15:23 - 17:2). During prosecution, the inventors added the phrase "wherein said

23  identification encoder gives items in said compressed data library a unique

24  identification code" to claim 1 and stated that this amendment was made to "more

25  clearly define the function of the identification encoder." (Exhibit GG at pp. 161, 165

26  
   _____

27  [8] Attached to the Block Supp. Decl. at Exhibit 24-27 are four U.S. patents
   4,425,754; 4, 087,753; 4,994,916; 5,204,900, respectively, each of which describes
   structures called "identification encoders." For the Court's convenience, each

28  reference to "identification encoder" in the patents is marked.