1    This phrase appears in claim 20 of the '992 patent. Claim 20 depends from claim 19 and

2    adds the limitation that the information in the items includes analog and digital signals and further

3    defines the first step of storing information from items as comprising the additional step of "ordering

4    converted analog signals and the formatted digital signals into a sequence of addressable data

5    blocks."

6    The patent specification states that the information in the items in the source material library

7    may include items in an analog format and items in a digital format:

8    The items stored in source material library 111 and encoded by
     identification encoder 112 may be in either analog or digital form.
9    Converter 113 therefore includes analog input receiver 127 and digital
     input receiver 124. If items have only one format, only one type of input
10   receiver 124 or 127 is necessary.

11   ('992 patent, 6:62-68).

12   The act of "ordering converted analog signals and the formatted digital signals into a

13   sequence of addressable data blocks" is described in the patent specification as requiring time

14   encoding:

15   The transmission system 100 of the present invention also preferably
     includes ordering means for placing the formatted information into a
16   sequence of addressable data blocks. As shown in FIG. 2a, the ordering
     means in the preferred embodiment includes time encoder 114. After the
17   retrieved information is converted and formatted by the converter 113, the
     information may be time encoded by the time encoder 114. Time encoder
18   114 places the blocks of converted formatted information from converter
     113 into a group of addressable blocks. The preferred addressing scheme
19   employs time encoding. Time encoding allows realignment of the audio
     and video information in the compressed data formatting section 117 after
20   separate audio and video compression processing by precompression
     processor 115 and compressor 116.

21
     The converted formatted information of the requested material is then
22   preferably in the form of a series of digital data bytes which represent
     frames of video data and samples of the audio data. A preferred
23   relationship of the audio and video bytes to each other is shown in FIG. 8.
     Incoming signals are input and converted in sequence, starting with the first
24   and ending with the last frame of the video data, and starting with the first
     and ending with the last sample of the audio data. Time encoding by time
25   encoder 114 is achieved by assigning relative time markers to the audio and
     video data as it passes from the converter 113 through the time encoder 114
26   to the precompression processor 115. Realignment of audio and video data,
     system addressing of particular data bytes, and user addressing of particular
27   portions of items are all made possible through time encoding.

28   ('992 patent, 7:59-8:23).

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

*The sequence of addressable data blocks which was time encoded and output by time encoder 114* is preferably sent to precompression processor 115.

('992 patent, 8:59-62; emphasis added).

As discussed above in Section No. 3 with respect to the phrase "storing, in the transmission system, information from items in a compressed data form, the information including an identification code and being placed into ordered data blocks," the term "ordered" is synonymous with "sequenced." Further, the Court has already construed the "ordering means for placing the formatted data into a sequence of addressable data blocks into a sequence of addressable data blocks" as a "time encoder" and similarly construed the phrase "sequence of addressable data blocks" as "time encoded data blocks" (July 12, 2004 Markman Order, at 22:16-21 and 23:3-6).

The Rounds 1 and 2 Defendants contend only that the term "addressable" in the phrase "sequence of addressable data blocks" refers to the "association between each data block and its storage location so that the transmission system can retrieve any individual data block by using its storage location." The term "addressable," as used in the phrase "sequence of addressable data blocks," does not refer to a storage location; rather, it refers to the ability to locate data blocks within an item anywhere in the system using relative time markers that have been assigned to the data blocks.

In the specification, the addressing scheme referred to in the phrase "sequence of addressable data blocks is time encoding: "[t]he preferred addressing scheme employs time encoding." ('992 patent, 8:1-2). The inventors described the addressing scheme provided by time encoding as providing addressability of the data blocks/frames within an item and making items addressable throughout the transmission system:

(1)     time encoding makes possible system addressing of particular data bytes and allows user addressing of particular portions of items:

> Realignment of audio and video data, system addressing of particular data bytes, and user addressing of particular portions of items are all made possible through time encoding.

('992 patent, 8:20-22).

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

(2)    time encoding makes possible the ability to address any particular block of audio or video data:

> Through the use of the address of an item and its frame number it is possible to address any particular block of audio or video data desired.

('992 patent, 8:24-26).

(3)    time encoding allows users to move through data in various modes by moving through frame addresses at various rates:

> Users are able to move through data in various modes, thus moving through frame addresses at various rates.

('992 patent, 8:34-36).

(4)    time encoding makes items and subsets of items retrievable and addressable throughout the transmission system:

> Time encoding by time encoder 114 makes items and subsets of items retrievable and addressable throughout the transmission system 100.

('992 patent, 8:50-52).

Giving further support to the inventor's intent to define "addressable" in the phrase "sequence of addressable data blocks" through time encoding is the fact that, in the specification, time encoding addressability is distinguished from two other types of addressability which are also described in the specification. The first type of addressability, not provided by time encoding, is the ability to locate an item stored within the compressed data library using its unique identification code:

> The file is addressable through the unique identification code assigned to the data by the identification encoder 112.

('992 patent, 10:26-30).

The second type of address is the address of the user, which is included in a user request for the item.

> The request contains the address of the user, the address of the item, and optionally includes specific frame numbers, and a desired viewing time of the item.

('992 patent, 12:24-25).

-35-

Thus, the addressability being provided by time encoding and described by the inventors is the addressability of video frames and/or audio samples within an item ("Time encoding by time encoder 114 makes items and subsets of items retrievable and addressable throughout the transmission system 100"), not the location of a data block at a specific storage location at a single point in the system, as the Rounds 1 and 2 Defendants contend. (See, e.g., '992 patent, 8:48-50).

The Round 3 Defendants contend that only one set of sequenced and addressable data blocks must be formed. As discussed above in Section No. 3, the claim phrase "storing, in the transmission system, information from items in a compressed data form, the information including an identification code and being placed into ordered data blocks," of which the phrase at issue is part of, refers to a plurality of items and therefore is not limited to a single set of sequenced and addressable data blocks. Acacia also disagrees with the Round 3 Defendants' proposed construction with respect to its use of the phrase "sequenced *and* addressable" The phrase at issue is "sequence *of* addressable data blocks" *not* "sequenced *and* addressable" data blocks.

### 12. The Order of the Steps of Claim 20 ('992 Patent, Claim 20)

| Acacia | In claim 20, the first storing step of claim 19 is comprised of the steps of claim 20. The steps of claim 20 must be performed in the following order: |
|---|---|
| | 1. "converting the analog signals . . ."; |
| | 2. "formatting the digital signals. . ."; |
| | 3. "ordering the converted analog signals and the formatted digital signals into a sequence of addressable data blocks"; and |
| | 4. "compressing the ordered information." |
| | There is no no limitation that any step of claim 20 begins and occurs only after a prior step or steps have been completed. |
| Rounds 1 and 2 Defendants | The steps of claim 20 of the '992 patent must be performed as part of the first step of storing in claim 19. The steps of claim 20 must be performed in the following order: |
| | 1. converting analog signals; |
| | 2. formatting the digital signals; |
| | 3. ordering the converted analog signals; and |
| | 4. compressing the ordered information. |

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

| | |
|---|---|
| | Defendants disagree with Acacia's statement that there is no limitation that any step of claim 20 begins and occurs only after a prior step or steps have been completed |
| Round 3 Defendants | The steps of claim 20 of the '992 patent must be performed as part of the first step of storing in claim 19. TheIn addition, the steps of claim 20 must be performed in the following order in which these steps are recited in the claim, namely:<br><br>    1. "converting the analog signals. . .";<br><br>    2. "formatting the digital signals. . .";<br><br>    3. "ordering the converted analog signals and the formatted digital signals. . ."; and<br><br>    4. "compressing the ordered information." |

The parties dispute the order of the steps of claim 20. Claim 20 includes a step of compressing formatted and ordered information. As discussed below in Section No. 20, with respect to the construction of the term "compressing the formatted and sequenced data blocks" in claim 41 of the '992 patent, the Round 3 defendants contend that the compressing step must only begin and occur after the formatting and sequencing steps have been completed. Acacia contends and sets forth the reasons why this is not a limitation of the compressing step of claim 41 of the '992 patent in Section No. 20.

Claim 20 contains the similar steps of formatting, ordering, and compressing as does claim 41. Based on the Round 3 Defendants' contentions with respect to the "compressing" step of claim 41, Acacia is concerned that the Round 3 will similarly seek to improperly include in claim 20 the limitation that the compressing step must only begin and occur after the formatting and sequencing steps have been completed. Acacia therefore seeks a construction for the order of the steps of claim 20 which specifies that there is no limitation that any step of claim 20 begins and occurs only after a prior step or steps have been completed.

## IV.    CLAIM 21 OF THE '992 PATENT

Claim 21 of the '992 patent also depends from claim 19. The parties only dispute the order in which the step of claim 21 is performed:

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

21. The method of claim 19 wherein the step of storing the items includes the substep of

storing the items in a plurality of compressed audio and video libraries in the transmission system.

### 13. The Order of the Steps of Claim 21 ('992 Patent, Claim 21)

| | |
|---|---|
| Acacia | The step of claim 21 is a substep of the first step of storing of claim 19. The substep of claim 21 can be performed either before, after, or simultaneously with the first step of storing of claim 19. |
| Rounds 1 and 2 Defendants | The step of claim 21 must be performed as part of the first step of storing of claim 19. Defendants disagree with Acacia's statement that the substep of claim 21 can be performed either before, after, or simultaneously with the first step of storing of claim 19 |
| Round 3 Defendants | The additional step of claim 21 is a substep of the first step of storing of claim 19. The substep of claim 21 must be performed after the steps set forth in the first step of storing in claim 19. |

Claim 21 depends from claim 19 and adds the substep to the first step of storing information of "storing the items in a plurality of compressed audio and video libraries in the transmission system." The only disputed issue with respect to this claim is the order in which the additional substep of claim 21 is performed in relation to the step of storing the information from the items.

The rule in the Federal Circuit for construing the order of the steps in a method claim is as follows:

Unless the steps of a method actually recite an order, the steps are not ordinarily construed to require one. However, such a result can ensue when the method steps implicitly require that they be performed in the order written. In this case, nothing in the claim or the specification directly or implicitly requires such a narrow construction.

*Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1369 (Fed. Cir. 2003), *quoting, Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1342-43 (Fed. Cir. 2000).

The court in *Interactive Express* set forth a two-part test for determining if the steps of a method claim that do not otherwise recite an order, must nonetheless be performed in the order in which they are written:

First, we look to the claim language to determine if, as a matter of logic or grammar, they must be performed in the order written. . . . If not, we next look to the rest of the specification to determine whether it "directly or

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

implicitly requires such a narrow construction." *Interactive Gift*, 256 F.3d at 1343, 59 USPQ2d at 1416. If not, the sequence in which such steps are written is not a requirement.

*Altiris*, 318 F.3d at 1369, *citing, Interactive Gift Express*, 256 F.3d at 1343.

The facts of the *Altiris* are similar to those in this case. In *Altiris,* the Court found that the claim steps were not required to be performed in any specific order, because no such order was required in the specification:

> In the case before us, nothing in the intrinsic evidence indicates that the "setting" step must be performed before the "booting normally" step. Beginning with the claim language, it neither grammatically nor logically indicates that the "setting" step must occur in a particular order compared to the other steps. The only order mandated by the claim language is the conditional language in several of the steps, indicating that they must be performed after the "testing" step.

> Looking next to the written description, it clearly only discusses a single "preferred" embodiment in which the "setting" step occurs after the "testing" step and before the "booting normally" step. Nowhere, however, is there any statement that this order is important, any disclaimer of any other order of steps, or any prosecution history indicating a surrender of any other order of steps.

*Altiris*, 318 F.3d at 1370-1371.

In this case, nothing in claims 19 or 21 specifies when the substep of claim 21 must be performed in relation to the storing step of claim 19. The same is true of the specification, which describes the use of multiple compressed data libraries and the use of compressed data libraries to store compressed audio and video information, but does not specify any order in which the data is stored onto the compressed data libraries:

> Instead of using a remote order processing and item database 300, the compressed data library 118 may include the program notes which were input by the system operator. The program notes may preferably include the title of the item stored in the compressed data library 118, chapter or song titles, running times, credits, the producer of the item, acting and production credits, etc. The program notes of an item stored in the compressed data library 118 may be thus contained within the compressed data file formed in the compressed data formatter 117.

> In some cases, where multiple compressed data libraries 118 are organized, the popularity code may dictate distribution of a particular item to multiple distribution systems. In such cases, a copy of the compressed data is sent to another library and the other library can then distribute the compressed data to users concurrently with the original compressed data library 118.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

The compressed data library 118 is composed of a network of storage devices connected through a High Performance Parallel Interface (HPPI) Super Controller (available from Maximum Strategy Inc., San Jose, Calif.). Therefore, multiple communication controllers may preferably access the large quantity of data stored in compressed data library 118 at very high speeds for transfer to a reception system 200 of a user upon request. For more details on this configuration see Ohrenstein, "Supercomputers Seek High Throughput and Expandable Storage", Computer Technology Review, pp. 33-39 April 1990.

The use of an HPPI controller allows file placement onto multiple mass storage devices of the compressed data library 118 with a minimum of overhead. Database management software controls the location and tracking of the compressed data library 118 which can be located across multiple clusters of file servers connected together by one or more high speed networks over multiple systems.

('992 patent, 12:58-13:28).

## V. CLAIM 23 OF THE '992 PATENT

Claim 23 of the '992 patent also depends from claim 19:

> 23. The distribution method as recited in claim 19, wherein the **[14] step of storing includes the step of storing the received information at the head end of a cable television reception system**.

**14. "The Step of Storing Includes the Step of Storing the Received Information at the Head End of a Cable Television Reception System" ('992 Patent, Claim 23)**

| | |
|---|---|
| Acacia | Claim 23 specifies that it is the second step of storing listed in claim 19 which includes the step of storing the received information at a cable head end. |
| Rounds 1 and 2 Defendants | Defendants agree with Acacia that "step of storing" here refers to the second "step of storing" in claim 19.<br><br>"Received information" means the information that was received at the selected remote location. |
| Round 3 Defendants | There are two "storing" steps in claim 19, from which claim 23 depends. The "step of storing" recited in claim 23 refers to the second step of storing in claim 19 of "storing a complete copy of the received information in the receiving system at the selected remote location." Pursuant to claim 23, the head end is the "selected remote location."<br><br>This claim term requires that when the user selects from among a plurality of (two or more) remote locations having receiving systems, the user selects that the requested information be sent to the head end of a cable television system for storage. The request by the user "for at least a part of the stored information" must include an identification of the head end to which the user wants the information sent. |

HENNIGAN, BENNETT & DORMAN LLP

LAWYERS

LOS ANGELES, CALIFORNIA

Claim 23 depends from claim 19 and states that "the step of storing includes the step of storing the received information at the head end of a cable television reception system."

There are two "steps of storing" in claim 19, but claim 23 does not explicitly identify to which step of storing it is referring. The parties all agree that claim 23 refers to the second step of storing in claim 19: "storing a complete copy of the received information in the receiving system at the selected remote location."

Therefore, according to claim 23, the second storing step of claim 19 includes two steps: (1) storing a complete copy of the received information in the receiving system at the selected remote location; and (2) storing the received information at the head end of a cable television reception system.

The patent specification describes and depicts systems which incorporate storing received information at the head end of a cable television reception system[9]:

> Reception system 200´ shown in FIG. 1f is a cable television system, as shown in reception systems 200´ of FIG. 1e. In FIG. 1f, the reception system 200´ is preferably buffering, which means that users may receive requested material at a delayed time. The material is buffered in intermediate storage device 200c in reception system 200´.

('992 patent, 4:37-44).

> In non-direct connection reception systems such as shown in reception system 200´ of FIG. 1f, intermediate storage device 200c may preferably include, for example, sixteen hours of random access internal audio and video storage. A reception system with such storage is capable of storing several requested items for future playback. The user could then view and/or record a copy of the decompressed requested material in real time, or compressed in non-real time, at a time of their choosing. Accordingly, the user would not have to make a trip to the store to purchase or rent the requested material.

('992 patent, 5:22-33).

---

[9] The head end of a cable television reception system would generally be understood by persons of skill in the art as the facility at a local cable TV office that originates and communicates cable TV services to subscribers. In distributing cable television services, the head-end receives incoming programming which is then passed on to the subscriber.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

The Round 3 Defendants contend that the head end of claim 23 is the remote location at which the information is received. This is not consistent with the language of claim 23. Claim 23 states that the step of storing *includes* the step of storing at the head end; it does not eliminate the receiving system at the selected remote location or eliminate the fact that the received information is received at the receiving system at the selected remote location.

The Rounds 1 and 2 Defendants contend that the "received information" means "the information that was received at the selected remote location." This proposed construction is incorrect. Claim 23 includes two storing steps – (1) storing information at the head end, and (2) storing a complete copy of information in the receiving system. The Rounds 1 and 2 Defendants contend that the information being stored in both instances is "the information that was received at the selected remote location." Defendants would require that the second step (storing the complete copy of information in the receiving system occur *before* the information is stored in the head end of the cable system. This is inconsistent with the specification, which states, as is well-known to persons of skill in the art, that the information is stored *first* at the head end, and *second* at the receiving system:

> Reception system 200′ shown in FIG. 1f is a cable television system, as shown in reception systems 200′ of FIG. 1e. In FIG. 1f, the reception system 200′ is preferably buffering, which means that users may receive requested material at a delayed time. The material is buffered in intermediate storage device 200c in reception system 200′.

('992 patent, 4:37-44).

> In non-direct connection reception systems such as shown in reception system 200′ of FIG. 1f, intermediate storage device 200c may preferably include, for example, sixteen hours of random access internal audio and video storage. A reception system with such storage is capable of storing several requested items for future playback. The user could then view and/or record a copy of the decompressed requested material in real time, or compressed in non-real time, at a time of their choosing. Accordingly, the user would not have to make a trip to the store to purchase or rent the requested material.

('992 patent, 5:22-33); *See. Vitronics,* 90 F.3d at 1583-1584 ("Indeed, if 'solder reflow temperature' were defined to mean liquidus temperature, a preferred (and indeed only) embodiment in the specification would not fall within the scope of the patent claim. Such an interpretation is

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1  rarely, if ever, correct and would require highly persuasive evidentiary support, which is wholly

2  absent in this case.").



FIG. 1f

13  The fact that claim 23 uses the term "received information" does not affect this construction.

14  The information being stored in both steps is the same information and it is still "received

15  information" even if it is stored at the head end of the cable system before it is received at the

16  receiving system. It is still received, and a complete copy of it is stored, at the receiving system.

17       15.    The Order of the Steps of Claim 23 ('992 Patent, Claim 23)

| Acacia | The step of claim 23 is part of the second step of storing of claim 19. The step of claim 23 is performed before the second step of storing of claim 19. |
| Rounds 1 and 2 Defendants | The step of claim 23 must be performed as part of the second step of storing of claim 19. Defendants disagree with Acacia's statement that the step of claim 23 is performed before the second step of storing of claim 19 |
| Round 3 Defendants | The additional step of claim 23 further defines the second step of storing of claim 19. |

24  The parties dispute the order of the steps of claim 23. For the reasons discussed immediately

25  above, with respect to construction of the phrase in claim 23 (Section No. 14), Acacia contends that

26  the step of claim 23 is performed before the second step of storing of claim 19. See, Altiris, 318

27  F.3d at 1369.

28

          ACACIA'S LEGAL MEMORANDUM RE DEFINITIONS
OF CLAIM TERMS FROM THE '992 AND '275 PATENTS

Hennigan, Bennett & Dorman llp
lawyers
los angeles, california

## VI.    CLAIM 24 OF THE '992 PATENT

Claim 24 of the '992 patent also depends from claim 19:

> 24. The distribution method as recited in claim 19, wherein **[16] the step of storing includes the step of storing the received information in an intermediate storage device**.

### 16.    "The Step of Storing Includes the Step of Storing the Received Information in an Intermediate Storage Device" ('992 Patent, Claim 24)

| | |
|---|---|
| Acacia | Claim 24 specifies that it is the second step of storing of claim 19 which includes the step of storing the received information in an intermediate storage device, i.e., a storage device (a device that stores) which is between the transmission system and the receiving system. |
| Rounds 1 and 2 Defendants | Defendants agree with Acacia that "step of storing" here refers to the second "step of storing" in claim 19.<br><br>Defendants agree with Acacia that "intermediate storage device" means a storage device that is between the transmission system and the receiving system.<br><br>"Received information" means the information that was received at the selected remote location. |
| Round 3 Defendants | There are two "storing" steps in claim 19, from which claim 24 depends. "The step of storing" recited in claim 24 refers to the second step of storing in claim 19 of "storing a complete copy of the received information in the receiving system at the selected remote location." Pursuant to claim 24, the "intermediate storage device" is at the "selected remote location."<br><br>This claim term requires that when the user selects from among a plurality of (two or more) remote locations having receiving systems, the user selects that the requested information be sent to the "intermediate storage device" for storage. The request by the user "for at least a part of the stored information" must include an identification of the "intermediate storage device" to which the user wants the information sent.<br><br>An "intermediate storage device" is a storage device at the remote location which is at a location other than where the user experiences the play back. |

Claim 24 depends from claim 19 and states that "the step of storing includes the step of storing the received information in an intermediate storage device."

There are two "steps of storing" in claim 19, but claim 24 does not explicitly identify to which step of storing it is referring. The parties all agree that claim 24 refers to the second step of

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

storing in claim 19: "storing a complete copy of the received information in the receiving system at the selected remote location."

Therefore, according to claim 24, the second storing step of claim 19 includes two steps: (1) storing a complete copy of the received information in the receiving system at the selected remote location; and (2) storing the received information in an intermediate storage device.

The patent specification describes and depicts systems which incorporate storing received information at the head end of a cable television reception system:

> Reception system 200´ shown in FIG. 1f is a cable television system, as shown in reception systems 200´ of FIG. 1e. In FIG. 1f, the reception system 200´ is preferably buffering, which means that users may receive requested material at a delayed time. The material is buffered in intermediate storage device 200c in reception system 200´.

('992 patent, 4:37-44).

> In non-direct connection reception systems such as shown in reception system 200´ of FIG. 1f, intermediate storage device 200c may preferably include, for example, sixteen hours of random access internal audio and video storage. A reception system with such storage is capable of storing several requested items for future playback. The user could then view and/or record a copy of the decompressed requested material in real time, or compressed in non-real time, at a time of their choosing. Accordingly, the user would not have to make a trip to the store to purchase or rent the requested material.

('992 patent, 5:22-33).

Acacia and the Rounds 1 and 2 Defendants agree that the intermediate storage device is a storage device that is between the transmission system and the receiving system.

The Round 3 Defendants contend that the intermediate storage device is a storage device at the remote location which is at a location other than where the user experiences the play back. Claim 24 does not state that the intermediate storage device is located at the remote location. Claim 24 states that the step of storing *includes* the step of storing in the intermediate storage device; it does not eliminate the receiving system at the selected remote location or eliminate the fact that the received information is received at the receiving system at the selected remote location.

The Rounds 1 and 2 Defendants contend that the "received information" means "the information that was received at the selected remote location." Acacia discussed this proposed construction with respect to claim 23 (Section No. 14, above). Claim 24, like claim 23, includes

-45-

Hennigan, Bennett & Dorman llp
lawyers
los angeles, california

two storing steps – (1) storing information at the intermediate storage device, and (2) storing a complete copy of information in the receiving system. As with claim 23, the Round 1 and 2 Defendants' construction would be inconsistent with the specification, which states, as is well-known to persons of skill in the art, that the information is stored first at an intermediate storage device, and second at the receiving system:

> Reception system 200´ shown in FIG. 1f is a cable television system, as shown in reception systems 200´ of FIG. 1e. In FIG. 1f, the reception system 200´ is preferably buffering, which means that users may receive requested material at a delayed time. The material is buffered in intermediate storage device 200c in reception system 200´.

('992 patent, 4:37-44).

> In non-direct connection reception systems such as shown in reception system 200´ of FIG. 1f, intermediate storage device 200c may preferably include, for example, sixteen hours of random access internal audio and video storage. A reception system with such storage is capable of storing several requested items for future playback. The user could then view and/or record a copy of the decompressed requested material in real time, or compressed in non-real time, at a time of their choosing. Accordingly, the user would not have to make a trip to the store to purchase or rent the requested material.

('992 patent, 5:22-33); See. Vitronics, 90 F.3d at 1583-1584.



FIG. 1f

17. The Order of the Steps of Claim 24 ('992 Patent, claim 24)

| Acacia | The step of claim 24 is part of the second step of storing of claim 19. The step of claim 24 is performed before the second step of storing of claim 19. |
| --- | --- |

| | |
|---|---|
| Rounds 1 and 2 Defendants | The step of claim 24 must be performed as part of the second step of storing of claim 19. Defendants disagree with Acacia's statement that the step of claim 24 is performed before the second step of storing of claim 19. |
| Round 3 Defendants | The additional step of claim 24 further defines the second step of storing of claim 19. |

The parties dispute the order of the steps of claim 24. For the reasons discussed immediately above, with respect to construction of the phrase in claim 24 (Section No. 16), Acacia contends that the step of claim 23 is performed before the second step of storing of claim 19. *See, Altiris*, 318 F.3d at 1369.

## VII.    CLAIM 41 OF THE '992 PATENT

Claim 41 of the '992 patent is an independent method claim:

> 41. A **[18] method of transmitting information to [2] remote locations, the transmission method comprising the steps, performed by a transmission system,** of:
>
> > storing items having information in a source material library;
> >
> > retrieving the information in the items from the source material library;
> >
> > assigning a unique identification code to the retrieved information;
> >
> > placing the retrieved information into a predetermined format as formatted data;
> >
> > placing the formatted data into a **[19] sequence of addressable data blocks**;
> >
> > **[20] compressing the formatted and sequenced data blocks;**
> >
> > storing, as a file, the compressed, formatted, and sequenced data blocks with the assigned unique identification code; and
> >
> > **[21] sending at least a portion of the file to one of the remote locations.**

**18.    "A Method of Transmitting Information to Remote Locations, the Transmission Method Comprising the Steps, Performed by a Transmission System, of" and "Comprises the Steps, Performed By a Transmission System" ('992 Patent, Claims 20, 41)**

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

| Acacia | These preambles are not limiting. |
| --- | --- |
| Rounds 1 and 2 Defendants | The preamble of claim 41 is a limitation, and requires, *inter alia*, that the steps of the claimed method must be performed by the transmission system. |
| Round 3 Defendants | All of the steps recited in claims 20 and 41 must be performed automatically by a transmission system (not by a human). |

The phrase "comprises the steps, performed by a transmission system" appears in the preamble of claim 20 of the '992 patent and the similar phrase "a method of transmitting information to remote locations, the transmission method comprising the steps, performed by a transmission system, of" appears in the preamble of claim 41 of the '992 patent.

As discussed above, in Section No. 1, a claim preamble which merely describes the use of an invention does not limit the claims. *Catalina Mktg.*, 289 F.3d at 809; *Intirtool*, 369 F.3d at 1295. Similarly, a claim preamble is not limiting where the preamble provides a "reference point" that "provides guidance in understanding and construing the claim." *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340 (Fed. Cir. 1998), *citing*, *Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A.*, 944 F.2d 870 (Fed. Cir. 1991).

The reference to the "transmission system" in the preambles of claims 20 and 41 are references points which provide guidance in understanding and construing the claims. As the Court found in Markman I, the references to the transmission system in the preamble of claims 1 and 41 of the '992 patent provide the reference point necessary to determine that the remote locations are locations remote from the transmission system:

> The Court finds that the ordinary meaning of the term "remote locations" is "positions or sites distant in space from some identified place." In the context of claims 1 and 41, the ordinary meaning of the term is "positions or sites distant in space from the transmission system." In the context of claim 1 the term "remote locations" is described in relation to the transmission system in the preamble that recites "[a] transmission system for providing information to be transmitted to remote locations. . ." Similarly, in claim 41, the "remote locations" are sites remote from the transmission system to which at least a portion of the file is sent.

(Markman I, at 4:16-22).

Thus, the reference to the steps of the claimed method being performed by the transmission system is not a structural limitation requiring that the steps be performed by only a transmission

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

system; it is merely a reference point so that the remote locations are understood to be remote from the transmission system.

The *C.R. Bard* and *Vaupel* cases are on point.  In *C.R. Bard*, the claim was for a "biopsy needle," but the preamble of the claim included a statement that the needle was for use with a tissue sample housing having a number of stated structures:

> 21. A biopsy needle for use with a tissue sampling device having a housing with a forward end, a first slide mounted for longitudinal motion within said housing, and a second slide mounted for longitudinal motion within said housing, said biopsy needle comprising:

*C.R. Bard*, 157 F.3d at 1348-1349.

The Court found that this preamble was not limiting, because it only provided reference points for the claimed needle.  *C.R. Bard*, 157 F.3d at 1350 ("In the case at bar, the preamble of claim 21 recites the portion and structure of the gun housing into which the needles fit, and provides reference points in the gun that aid in defining the needles as set forth in the body of the claim.")

In *Vaupel*, the claim was for a method for forming a plurality of patterned strips of fabric and the preamble stated that the fabric is woven using a "broad weaving machine" having a number of features, including a breast beam:

> 1. A method of forming a plurality of patterned strips of fabric woven from threads of synthetic material using a broad weaving machine having a sley and a breast beam, which method comprises:

*Vaupel*, 944 F.2d at 872.

The accused infringer contended that it did not infringe, because its device which performed the method did not include the "breast beam," which was stated in the claim preamble.  The court disagreed, because it found that the "breast beam" was not a structural limitation, but rather was a reference point:

> MEI argues that the preamble language "breast beam" and "breast plate" of Claims 1 and 2, respectively, requires a specific loom part which is absent from its accused device, and that the district court erred in concluding that the terms were used "only to fix the direction of movement of the woven fabric on the loom" and not to constitute claim limitations. After reviewing the claims, the specification and drawings, the prosecution history, and the expert testimony, we conclude that the district court was correct. "Breast beam" and "breast plate" are not structural limitations of Claims 1 and 2; as used in Claims 1 and 2, they indicate a reference point to fix the direction of movement of the woven fabric from the loom. Such alleged loom "parts"

-49-

are not illustrated in any of the figures of the '650 patent or otherwise described in the specification.

*Vaupel*, 944 F.2d at 879-880.

Thus, even though the claim preamble included the language that the method was performed using a "broad weaving machine having a sley and a breast beam," the court did not require that such a machine be a structural limitation of the claims, as defendants contend here with respect to the transmission system. The reference to the method of claims 20 and 41 being performed by a transmission system therefore is not a structural limitation, but rather is a point of reference for the remote locations.

The Round 3 Defendants contend that the preamble language in claims 20 and 41 requires that all of the steps of claims 20 and 41 must be performed "automatically by a transmission system (not by a human)." This limitation is not stated in either of these claims. Further, the specification very clearly does not require that the transmission system operate automatically or without human intervention. The specification describes how a *system operator* operates the transmission system:

> User and system addressing requirements dictate the level of granularity available to any particular section of the system. Users are able to move through data in various modes, thus moving through frame addresses at various rates. For example, a user may desire to listen to a particular song. They may preferably enter the song number either when requesting the item from the compressed data library 118 and only have that song sent to their receiving system 200 or they may preferably select that particular song from the items buffered in their receiving system 200. Internal to the system, the song is associated with a starting frame number, which was indexed by the *system operator* via the storage encoding process.

('992 patent, 8:32-45; emphasis added).

> The unique address code is an address assigned to the item by the *system operator* during storage encoding, which is preferably done prior to long term storage in the compressed data library 118.

('992 patent, 10:58-61; emphasis added).

> The storage encoding entry process performed in identification encoder 112 operates a program which updates a master item database containing facts regarding items in the compressed data library system. The storage encoding process may be run by the *system operator* whereby the *system operator* accesses the master item database to track and describe items stored in one or more compressed data libraries.

('992 patent, 11:9-17; emphasis added).

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

Instead of using a remote order processing and item database 300, the compressed data library 118 may include the program notes which were input by the *system operator*.

('992 patent, 12:58-61; emphasis added).

Therefore, the Court cannot add the limitation to claims 20 and 41 that all of the steps must only be performed by a transmission system or that all of the steps are performed only automatically and without human intervention.

### 19. "Sequence of Addressable Data Blocks" ('992 Patent, Claim 41)

| Acacia | The phrase "sequence of addressable data blocks" has already been construed by the Court to mean time encoded data blocks. |
|---|---|
| Rounds 1 and 2 Defendants | See construction of 'addressable' above in term number 11. |
| Round 3 Defendants | "Sequence of addressable data blocks" is a term which the Court has already construed, meaning TWC and CSC will be heard as to the construction of this term during the August 11, 2006 Markman hearing. For this reason, the construction of "sequence of addressable data blocks" will be addressed on a schedule to be agreed upon for disclosure and briefing for the August 11 hearing. |

The phrase "sequence of addressable data blocks" appears in claim 41 of the '992 patent in the phrase "placing the formatted data into a sequence of addressable data blocks." Acacia has already discussed the construction for the phrase "sequence of addressable data blocks" in Section 11 with respect to the phrase from claim 20 of the '992 patent: "ordering the converted analog signals and the formatted digital signals into a sequence of addressable data blocks."

The Court has already construed the "ordering means for placing the formatted data into a sequence of addressable data blocks into a sequence of addressable data blocks" as a "time encoder" and similarly construed the phrase "sequence of addressable data blocks" as "time encoded data blocks." (July 12, 2004 Markman Order, at 22:16-21 and 23:3-6).

The Rounds 1 and 2 Defendants contend only that the term "addressable" in the phrase "sequence of addressable data blocks" refers to the "association between each data block and its storage location so that the transmission system can retrieve any individual data block by using its storage location." As Acacia demonstrated in Section No. 11, *supra,* the term "addressable," as used

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

in the phrase "sequence of addressable data blocks," does not refer to a storage location; rather, it refers to the ability to locate data blocks within an item anywhere in the system using relative time markers that have been assigned to the data blocks. (*See,* '992 patent, 8:20-22; 8:24-26; 8:34-36; and 8:50-52). Thus, the addressability being provided by time encoding and described by the inventors is the addressability of video frames and/or audio samples within an item ("Time encoding by time encoder 114 makes items and subsets of items retrievable and addressable throughout the transmission system 100"), not the location of a data block at a specific storage location.

### 20. "Compressing the Formatted and Sequenced Data Blocks" ('992 Patent, Claim 41)

| Acacia | The phrase "compressing the formatted and sequenced data blocks" does not require construction, however, it may be described as the act of condensing the amount of data in the formatted and sequenced data blocks. |
|---|---|
| Rounds 1 and 2 Defendants | Does not need construction. |
| Round 3 Defendants | Compression begins and occurs only after the steps of "placing the retrieved information into a predetermined format as formatted data" and "placing the formatted data into a sequence of addressable data blocks" have been completed. The sequence of the formatted data blocks must be maintained by the compression process. |

The phrase "compressing the formatted and sequenced data blocks" appears in claim 41 of the '992 patent.

Neither Acacia nor the Rounds 1 and 2 Defendants believe that this phrase requires construction. This phrase merely requires that the formatted and sequenced data blocks, created in the prior two steps, are compressed. Compression would have been understood by persons skilled in the art and it is described in the specification as condensing the amount of data.

The Round 3 Defendants contend that the act of compression "begins and occurs" only after the previous two steps have been completed. There is nothing in claim 41 or in the specification that states that the compression step only begins and occurs after the prior two steps have been completed. The Court should not add this unnecessary and incorrect limitation to claim 41. *See, Hoganas*, 9 F.3d at 950.

The Round 3 Defendants further contend that the "sequence of the formatted data blocks must be maintained by the compression process." This limitation is not stated in claim 41. Claim 41 merely states that the "formatted and sequenced data blocks" are compressed. This does not impose a limitation that the sequence of formatted data blocks is maintained by the compression process; it just means that the data blocks that are compressed are the formatted data blocks which were placed into the sequence of addressable data blocks in the prior step. Further, nothing in the specification requires, or even states, that the sequence of formatted data blocks must be maintained during the compression process. (*See, e.g.*, '992 patent, 9:41-10:16).

### 21. "Sending at Least A Portion of The File to One of the Remote Locations" ('992 Patent, Claim 41)

| Acacia | The phrase "sending at least a portion of the file to one of the remote locations" does not require construction, however, it may be described as the act of sending (i.e., transmitting) a portion of a file or the entire file (i.e., a named collection of data) to one or more of the remote locations (i.e, one or more positions or sites distant in space from the transmission system). |
|---|---|
| Rounds 1 and 2 Defendants | The phrase "to one of the remote locations" means "to one and only one of the remote locations." |
| Round 3 Defendants | At least a portion of the file that was stored in the preceding step of claim 41 of "storing, as a file, the compressed, formatted and sequenced data blocks with the assigned unique identification code" is taken from the place where the information was stored in the preceding step of storing and sent to one of the remote locations. |

The phrase "sending at least a portion of the file to one of the remote locations" appears in claim 41 of the '992 patent.

Acacia contends that this phrase should be construed such that the portion of the file is sent to one or more of the remote locations. Both groups of defendants, however, contend that the portion of the file is sent to one of the remote locations. The Rounds 1 and 2 Defendants further contend that the portion of the file is sent "to one *and only one* of the remote locations."

The language of claim 41 does *not* require that the portion of the file be sent to one *and only one* of the remote locations. The preamble of claim 41 states that the intended purpose of the claimed method is to transmit information to *more than one* remote location: "[a] method of transmitting information to remote locations." Further, claim 41 uses the transition phrase

-53-

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

"comprising": "the transmission method *comprising* the steps, . . ., of," meaning that the patentees did not intend to limit the sending step to sending the file or portion of the file to *one and only one* remote location. *See, Scanner Technologies*, 365 F.3d at 1304-05 ("Where an open 'comprising' claim includes the article 'a' or 'an,' and the specification is at best inconclusive on the patentee's intent to limit that article to a single element or step, we do not find a "clear intent" to so limit the claims.").

The defendants appear to be relying on the fact that the phrase at issue states: "sending at least a portion of the file to *one* of the remote locations." The term "one" is used in this portion of the claim in the same manner that the term "a" would be used, and therefore the term should be construed to mean "one or more." *Free Motion Fitness,* 423 F.3d at 1350-1351; *Collegenet*, 418 F.3d at 1232; *KCJ Corp.*, 223 F.3d at 1357.

The claim language "to one of the remote locations," does not itself state that the file or the portion of the file is sent to "one *and only one* of the remote locations." The Rounds 1 and 2 Defendants are importing limitations into the claim which do not exist. Indeed, when the claim is considered as a whole – the preamble referring to sending information to remote locations, the use of the open-ended transition "comprising," and the lack of the one-and-only-one limitation – it is clear that the patentees did not intend to limit claim 41 to sending the file or the portion of the file to one and only one remote location. Rather, the patentees intended that claim 41 would cover sending the file or the portion of the file to at least one remote location.

The fact that the patentees did not intend to limit claim 41 to sending the file or the portion of the file to one and only one remote location is further confirmed by the patent specification. The patent specification discloses a number of embodiments in which the file or the portion of the file is sent to at least one remote location. Claim 41 does not require a user request and therefore these embodiments would be covered by claim 41:

> FIG. 1g shows a high level block diagram of the transmission and receiving system of the present invention including transmission system 100 distributing to a reception system 200, which then preferably transmits requested material over airwave communication channels 200d, *to a plurality of users*. The transmission and receiving system shown in FIG. 1g may preferably transmit either compressed or uncompressed data, depending on the requirements and existing equipment of the user. The

-54-

airwave transmission and receiving system shown in FIG. 1g may preferably employ either VHF, UHF or satellite broadcasting systems.

('992 patent, 4:52-63; emphasis added).

The queue manager program also manages the file transmission process for multiple requests for a single file, stored in the compressed data library 118. During a given time period, the queue manager program will optimize access to the compressed data library 118, wherever possible it will place the data on multiple outputs for *simultaneous transmission to more than one requesting user*.

('992 patent, 15:47-54; emphasis added).

The transmission system 100 of the present invention preferably further includes transmitter means 122, coupled to the compressed data library 118, for s*ending at least a portion of a specific file to at least one remote location*. The transmission and receiving system of the present invention preferably operates with any available communication channels. Each channel type is accessed through the use of a communications adaptor board or processor connecting the data processed in the transmission format converter 119 to the transmission channel.

('992 patent, 15:61-16:3; emphasis added).

This issue is similar to that in the *Scanner Technologies* case. In *Scanner Technologies,* the court found no intent by the patentees to limit the claim term "an illumination apparatus" to one and only one illumination apparatus. *Scanner Technologies*, 365 F.3d at 1304-05. Like claim 41, the claim-at-issue in *Scanner Technologies* used the phrase "comprising." *Id.* Further, although the claims included other limitations in which the claim language made clear the intent to cover multiple components, this was insufficient evidence of the patentees' intent to limit the "illumination apparatus" to one and only one illumination apparatus:

Here, we discern no intent on the part of the patentees to limit the term "an illumination apparatus" to a single illumination source in either the claim language or the specification. Though ICOS argues, and we acknowledge, that claim 1 of the '756 patent and the specification call out other limitations with multiple components, e.g., "first camera" to take "a first image" and "second camera" to take "a second image," we do not agree that the failure to specifically refer to a "first illumination apparatus" and a "second illumination apparatus" evinces a clear intent on the part of the patentee that the term be limited to a single illumination source. Indeed, the very use of the article "an" indicates, at least presumptively, that the patentees intended the claim language "an illumination apparatus" to mean one or more illumination sources, and thus to cover implicitly "a first illumination apparatus" and subsequent "illumination apparatuses" where they exist. To limit the claim term "an illumination apparatus" to one illumination source, we require much stronger evidence of the patentees' intent than strained extrapolation from

-55-

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

> the language employed by the patentees in other claim limitations. Barring some evidence that the patentees intended to limit the claims to a single illumination source, evidence we do not find in the claim language, their use of the term "an" is consistent with multiple illumination sources.

*Scanner Technology*, 365 F.3d at 1304-05.

The court further found that the specification was inconclusive as to whether the patentees intended to limit the illumination apparatus to one and only one illumination source. *Scanner Technologies*, 365 F.3d at 1305 ("Turning to the specification, we find no evidence of a clear intent on the part of the patentees to limit the claim language at issue to a single illumination source. Even where the specification refers to 'a light source,' there is no indication that the patentee intended to limit the claims to the single light source.") The Court therefore found that there was no clear intent by the patentees to limit the illumination apparatus to one and only one illumination apparatus and thus did not limit the construction of the illumination apparatus to a single illumination apparatus. *Id.* ("Where an open 'comprising' claim includes the article 'a' or 'an,' and the specification is at best inconclusive on the patentee's intent to limit that article to a single element or step, we do not find a 'clear intent' to so limit the claims.")

The facts are even more compelling in this case than they were in *Scanner Technology*. In this case, the claim itself states that its intended purpose is to "transmit information to remote locations," the claim uses the transition "comprising," the claim does not state that the file or the portion of the file is sent to one *and only one* remote location, and the specification specifically provides embodiments, covered by claim 41, in which the file or the portion of the file is sent to at least one remote location. (*See, e.g.,* '992 patent, 15:61-16:3). These facts amply demonstrate that the patentees did not intend to limit claim 41 to sending a file or a portion of a file to one and only one remote location, and therefore it would be improper for the Court to so construe this phrase of claim 41.

### 22. The Order of the Steps of Claim 41 ('992 Patent, Claim 41)

| Acacia | The steps of claim 41 of the '992 patent must be performed in the following order:<br><br>    1. "storing items having information in a source material library"; |
|---|---|

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

| | |
|---|---|
| | 2. "retrieving the information . . ."; |
| | 3. "assigning a unique identification code. . ."; |
| | 4. "placing the retrieved information into formatted data. . ."; |
| | 5. "placing the formatted data into a sequence of addressable data blocks"; |
| | 6. "compressing the formatted and sequenced data blocks:; |
| | 7. "storing, as a file, . . ."; and |
| | 8. "sending at least a portion of the file. . .". |
| | There is no limitation that any step of claim 41 begins and occurs only after a prior step or steps have been completed. |
| Rounds 1 and 2 Defendants | The steps of claim 41 of the '992 patent must be performed in the following order: <br><br> 1. storing items in a source material library; <br><br> 2. retrieving the information; <br><br> 3. assigning a unique identification code; <br><br> 4. placing into formatted data; <br><br> 5. placing into a sequence of addressable data blocks; <br><br> 6. compressing; <br><br> 7. storing; and <br><br> 8. sending. <br><br> Each step of claim 41 begins and occurs only after a prior step or steps have been completed. |
| Round 3 Defendants | The steps of claim 41 of the '992 patent must be performed in the following order in which these steps are recited in the claim, namely: <br><br> 1. "storing items having information in a source material library"; <br><br> 2. "retrieving the information. . ."; <br><br> 3. "assigning a unique identification code. . ."; <br><br> 4. "placing the retrieved information into a predetermined format  as formatted data"; <br><br> 5. "placing the formatted data into a sequence of addressable data blocks"; |

-57-

| | 6. "compressing the formatted and sequenced data"; |
|---|---|
| | 7. "storing, as a file. . ."; and |
| | 8. "sending at least a portion of the file . . .". |

The parties dispute the order of the steps of claim 41. Claim 41 includes a step of compressing formatted and sequenced information. As discussed above in Section No. 20, with respect to the construction of the term "compressing the formatted and sequenced data blocks" in claim 41 of the '992 patent, the Round 3 defendants contend that the compressing step must only begin and occur after the formatting and sequencing steps have been completed. The Rounds 1 and 2 Defendants further contend that each step of claim 41 begins and occurs only after a prior step or steps have been completed. As discussed above in Section No. 20, there is no limitation in claim 41 or the patent specification that any step of claim 41 of the '992 patent must begin and occur only after a prior step or steps have been completed.

Acacia therefore seeks a construction for the order of the steps of claim 41 which specifies that there is no limitation that any step of claim 20 begins and occurs only after a prior step or steps have been completed.

## VIII. CLAIM 42 OF THE '992 PATENT

Claim 42 of the '992 patent depends from claim 41. The parties only dispute the order in which the steps of claim 42 are performed:

> 42. A transmission method as recited in claim 41, wherein the step of placing further includes the steps of:
>
> A/D converting analog signals of the retrieved information into a series of digital data bytes; and
>
> converting the series of digital data bytes into formatted data with a predetermined format.

### 23. The Order of the Steps of Claim 42 ('992 Patent, Claim 42)

| Acacia | The steps of claim 42 are part of the step of placing listed in claim 41 relating to "placing the retrieved information into a predetermined format as formatted data."<br><br>The steps of claim 42 must be performed in the following order: |
|---|---|

| | | |
|---|---|---|
| | | 1. A/D converting analog signals into a series of digital data bytes; and<br><br>2. Converting the series of digital data bytes into formatted data.<br><br>The steps of claim 42 are performed either before, after, or simultaneously with the step of placing into a predetermined format of claim 41. |
| Rounds 1 and 2 Defendants | | The steps of claim 42 must be performed as part of "the placing the retrieved information into a predetermined format as formatted data" step of claim 41. The steps of claim 42 must be performed in the following order:<br><br>1. A/D converting analog signals into a series of digital data bytes;<br><br>2. Converting series of digital data bytes into formatted data.<br><br>Defendants disagree that the steps of claim 42 are performed either before, after, or simultaneously with the step of placing into a predetermined format of claim 41. |
| Round 3 Defendants | | Claim 42 – The additional steps of claim 42 further define the placing the retrieved information step of claim 41. TheIn addition, the steps of claim 42 must be performed in the following order in which these steps are recited in the claim, namely:<br><br>• "A/D Convertingconverting analog signals. . .";<br><br>• Converting"converting the series of digital data bytes . . .". |

Claim 42 depends from claim 41 of the '992 patent. Claim 42 states that the step of "placing the retrieved information into a predetermined format as formatted data" includes the steps of A/D converting [analog-to-digital] analog signals into a series of digital data bytes and converting the series of digital data bytes into formatted data.

With respect to claim 42, the parties' only dispute is when the two steps of claim 42 must be performed. Acacia contends that the two steps of claim 42 are performed before, after, or simultaneously with the step of "placing the retrieved information into a predetermined format" of claim 41. *See, Altiris*, 318 F.3d at 1369. Defendants contend that the two steps are part of the step of placing of claim 41, but do not specify when they are performed in relation to the step of placing of claim 41.

## IX. CLAIM 43 OF THE '992 PATENT

Claim 43 of the '992 patent also depends from claim 41. The parties only dispute the order in which the step of claim 43 is performed:

HENNIGAN, BENNETT & DORMAN LLP<br>LAWYERS<br>LOS ANGELES, CALIFORNIA

43. A transmission method as recited in claim 41, wherein the step of placing further includes the steps of:

converting digital signals of the retrieved information into predetermined voltage levels; and

converting the predetermined voltage levels into formatted data with a predetermined format.

### 24. The Order of the Steps of Claim 43 ('992 Patent, Claim 43)

| | |
|---|---|
| Acacia | The steps of claim 43 are part of the step of placing listed in claim 41 relating to "placing the retrieved information into a predetermined format as formatted data." <br><br> The steps of claim 43 must be performed in the following order: <br><br> 1. Converting digital signals into predetermined voltage levels; and <br><br> 2. Converting the predetermined voltage levels into formatted data. <br><br> The steps of claim 43 are performed either before, after, or simultaneously with the step of placing into a predetermined format of claim 41. |
| Rounds 1 and 2 Defendants | The steps of claim 43 must be performed as part of "the placing the retrieved information into a predetermined format as formatted data" step of claim 41. The steps of claim 43 must be performed in the following order: <br><br> 1. Converting digital signals into predetermined voltage levels; <br><br> 2. Converting the predetermined voltage levels into formatted data. <br><br> Defendants disagree that the steps of claim 43 are performed either before, after, or simultaneously with the step of placing into a predetermined format of claim 41. |
| Round 3 Defendants | Claim 43 – The additional steps of claim 43 further define the "placing the retrieved information. . ." step of claim 41. TheIn addition, the steps of claim 43 must performed in the following order in which these steps are recited in the claim, namely: <br><br> • "converting the digital signals. . ."; <br><br> • "converting the predetermined voltage levels. . ." |

Claim 43 depends from claim 41 of the '992 patent. Claim 43 states that the step of "placing the retrieved information into predetermined format as formatted data" includes the steps of converting digital signals into a predetermined voltage levels and converting the predetermined voltage levels into formatted data.

HENNIGAN, BENNETT & DORMAN LLP

LAWYERS

LOS ANGELES, CALIFORNIA

With respect to claim 43, the parties' only dispute is when the two steps of claim 43 must be performed. Acacia contends that the two steps of claim 43 are performed before, after, or simultaneously with the step of "placing the retrieved information into a predetermined format" of claim 41. *See, Altiris*, 318 F.3d at 1369. Defendants contend that the two steps are part of the step of placing of claim 41, but do not specify when they are performed in relation to the step of placing of claim 41.

## X.  CLAIM 44 OF THE '992 PATENT

Claim 44 of the '992 patent also depends from claim 41. The parties only dispute the order in which the step of claim 43 is performed:

> 44. A transmission method as recited in claim 41, wherein the step of placing further includes the step of converting digital signals of the retrieved information into formatted data with a predetermined format.

### 25.  The Order of the Step of Claim 44 ('992 Patent, Claim 44)

| | |
|---|---|
| Acacia | The step of claim 44 of the '992 patent is part of the step of "step of placing the retrieved information into a predetermined format as formatted data" in claim 41.<br><br>The step of claim 44 is performed either before, after, or simultaneously with the step of placing into a predetermined format of claim 41. |
| Rounds 1 and 2 Defendants | The step of claim 44 of the '992 patent is part of the step of "step of placing the retrieved information into a predetermined format as formatted data" in claim 41.<br><br>Defendants disagree that the step of claim 44 is performed either before, after, or simultaneously with the step of placing into a predetermined format of claim 41. |
| Round 3 Defendants | The step of claim 44 of the '992 patent is part of the step of "step of placing the retrieved information into a predetermined format as formatted data" in claim 41. |

Claim 44 depends from claim 41 of the '992 patent. Claim 44 states that the step of "placing the retrieved information into predetermined format as formatted data" includes the step of "converting digital signals of the retrieved information into formatted data with a predetermined format."

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

With respect to claim 44, the parties' only dispute is when the step of claim 44 must be performed. Acacia contends that the step of claim 44 is performed before, after, or simultaneously with the step of "placing the retrieved information into a predetermined format" of claim 41. *See, Altiris*, 318 F.3d at 1369. Defendants do not specify when the step of claim 44 is performed in relation to the step of placing of claim 41.

## XI. CLAIM 45 OF THE '992 PATENT

Claim 45 of the '992 patent also depends from claim 41

45. A transmission method as recited in claim 41, wherein the storing step further comprises the step of:

**[26] separately storing a plurality of files, each including compressed, sequenced data blocks**.

### 26. "Separately Storing a Plurality of Files, Each Including Compressed, Sequenced Data Blocks" ('992 Patent, Claim 45)

| Acacia | The phrase "separately storing a plurality of files, each including compressed, sequenced data blocks" means the act of storing more than one file (i.e., named collections of data), wherein each file is stored separately (i.e., individually or independently from) the other stored files. |
|---|---|
| Rounds 1 and 2 Defendants | Indefinite. |
| Round 3 Defendants | Indefinite. |

Claim 45 depends from claim 41 of the '992 patent. Claim 45 states that the storing step (referring to step of "storing, as a file the compressed, formatted, and sequenced data blocks with the assigned unique identification code") includes the step of "separately storing a plurality of files, each including compressed, sequenced data blocks."

Claim 45 adds the step to claim 41 of separately storing a plurality of files, each file including compressed, sequenced data blocks. In other words, in addition to the file (having the compressed, formatted, and sequenced data blocks) that is stored pursuant to the storing step of claim 41, a plurality of additional files, each including compressed, sequenced data blocks, are separately stored.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

Both groups of defendants contend that claim 45 is indefinite. Acacia understands that the defendants contend that claim 45 is indefinite due to the last step of claim 41 stating that "the file" is sent. According to defendants, it is not clear which of the plurality of files is being sent.

Claim 45 is not indefinite. Independent claim 41 states that "a file" is stored and states that "the file" is sent. Dependent claim 45 merely states that a plurality of files is stored. Claim 45 in no way changes or modifies either the step of claim 41 which states that "a file" is stored or the step of claim 41 which states that "the file" is sent. It is obvious therefore that the file that was sent in claim 41 is the same file that was sent in claim 45. No defendant contends that claim 41 is indefinite, and therefore claim 45 must be definite.

None of the defendants contend that, if definite, any of the terms of claim 45 require construction. Acacia contends that claim 45 should be construed as the act of storing more than one file, wherein each file is stored separately (i.e., individually or independently from) the other stored files.

Acacia's proposed construction is consistent with the ordinary meanings of the terms of claim 45 and with the specification. The term "separately" is defined in the *Webster's Third New International Dictionary* (1993) as "individually; independently." (See Block Declaration, Exhibit 3). The term "storing" is defined in the *IEEE Standard Dictionary of Electrical and Electronic Terms, Sixth Edition* (1996) as "to place or retain data in a storage device." (See Block Declaration, Exhibit 4). The term "sequenced" is used in claim 41 and refers to formatted data blocks which have been placed into a "sequence of addressable data blocks," which has already been construed to mean "time encoded data blocks" (Markman I, at 22:16-21 and 23:3-6). The term "compressed" is used in claim 41 and refers to formatted, sequenced data blocks that have been compressed, i.e., condensed.

The specification describes the compressed data library as storing a plurality of files that are separate from one another:

> Further, according to the present invention, the transmission system preferably includes compressed data library means for *separately storing composite formatted data blocks for each of the files*. The compressed data storage means preferably includes compressed data library 118, as shown in FIG. 2b. After the data is processed into a file by the compressed data storage means 117, it is preferably stored in a compressed data library 118. In a preferred embodiment, compressed data library 118 is a network of

-63-

mass storage devices connected together via a high speed network. *Access to any of the files stored in compressed data library 118* is available from multiple reception systems 200 connected to the transmission and receiving system.

('992 patent, 10:31-45; emphasis added).

### 27.    The Order of the Steps of Claim 45 ('992 Patent, Claim 45)

| Acacia | The step of claim 45 is part of the "storing, as a file, . . ." step of claim 41. The step of claim 45 is performed either before, after, or simultaneously with the "storing, as a file, . . ." step of claim 41. |
|---|---|
| Rounds 1 and 2 Defendants | If the Court finds that claim 45 of the '992 patent is not indefinite, then the step of claim 45 must be performed as part of the "storing as a file" step of claim 41.<br><br>Defendants disagree that the step of claim 45 is performed either before, after, or simultaneously with the 'storing, as a file...." step of claim 41. |
| Round 3 Defendants | If the Court finds that claim 45 of the '992 patent is not indefinite, then the step of claim 45 must be performed as part of the "storing as a file" step of claim 41. |

The parties' dispute when the step of claim 45 must be performed. Acacia contends that the step of claim 45 is performed before, after, or simultaneously with the step of "storing, as a file, the compressed, formatted, and sequenced data blocks with the unique identification code" of claim 41. *See, Altiris*, 318 F.3d at 1369. Defendants do not specify when this step is performed in relation to the step of placing of claim 41.

## XII.    CLAIM 46 OF THE '992 PATENT

Claim 46 of the '992 patent also depends from claim 41:

> 46. A transmission method as recited in claim 45, further comprising the steps, performed by the transmission system, of:
>
> generating a listing of available items;
>
> **[28] receiving transmission requests to transmit available items**; and
>
> retrieving stored formatted data blocks corresponding to requests from users.

### 28.    "Receiving Transmission Requests to Transmit Available Items" ('992 Patent, Claim 46)

ACACIA'S LEGAL MEMORANDUM RE DEFINITIONS OF CLAIM TERMS FROM THE '992 AND '275 PATENTS

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

| Acacia | The phrase "receiving transmission requests to transmit available items" means the act of receiving requests, wherein the requests seek the transmission of available items, i.e., items which have been stored as files. |
|---|---|
| Rounds 1 and 2 Defendants | Indefinite. |
| Round 3 Defendants | Indefinite. |

Both groups of defendants contend that the second step of claim 46: "receiving transmission requests to transmit available items" is indefinite. Acacia understands that the defendants contend that this phrase is indefinite because claim 46 is dependent from claim 45, and defendants contend that claim 45 is indefinite, as discussed above in Section No. 26

None of the defendants contend that, if definite, any of the terms of claim 46 require construction. Acacia contends that the Court should construe the second step of claim 46 means "the act of receiving requests, wherein the requests seek the transmission of available items, i.e., items which have been stored as files, wherein each file comprises the compressed, formatted, and sequenced data blocks for an item."

None of the terms of the second step of claim 46 would have been difficult for a person of skill in the art to understand. *Phillips*, 415 F.3d at 1314. The constituent terms of this phrase – "receiving," "transmission," "requests," "transmit," "available," and "items" – each would have been readily understood by persons of ordinary skill in the art.

In claim 41 (and 45), a file is stored ("storing, as a file, the compressed, formatted, and sequenced data blocks with the assigned unique identification code") and at least a portion of the file is sent to a remote location ("sending at least a portion of the file to one of the remote locations"). There is no step or requirement in claim 41 that the file or portion of the file is sent in response to a transmission request. Claim 46 adds the step that a transmission request is received. Claim 46 further states that the request seeks to have transmitted "available items." From the context of claims 41 and 46, it is clear that "available items" refers to the stored file which is sent (i.e., transmitted) to a remote location, as described in claim 41.

Hennigan, Bennett & Dorman LLP
LAWYERS
LOS ANGELES, CALIFORNIA

The patent specification teaches persons of ordinary skill in the art that the phrase "available items" refers to the files stored in the compressed data library, the identity of which are listed for the user and which are transmitted to the user upon a user request. Items stored in the compressed data library are requested by the user and are sent (i.e., transmitted) to the user:

> A user of the transmission and receiving system of the present invention preferably accesses transmission system 100 by calling a phone number or by typing commands into a computer. *The user then chooses audio and/or video material from a list of available items which he or she wants to listen to and/or watch.*

('992 patent, 3:54-60; emphasis added).

> The transmission system 100 of the present invention may also preferably include library access/interface means for *receiving transmission requests to transmit items and for retrieving formatted data blocks stored in the compressed data library 118 corresponding to the requests from users.* The compressed audio and/or video data blocks, along with any of the information about the *item stored in the compressed data library 118* may be accessed via library access interface 121. The library access interface 121 receives transmission requests either directly from the users or indirectly by remote order processing and item database 300. The transmission format means 119 receives the request and retrieves the composite formatted data block of the requested item stored in compressed data library 118 and converts the compressed formatted data block into a format suitable for transmission. *The requested item is then sent to the user via the transmitter 122 or directly via interface 121.*

('992 patent, 13:29-47; emphasis added).

> Access by a user terminal interface method provides the user with access from various terminals including personal computers, and specialized interfaces built into the reception system 200 for the user. Such access allows a user to do a search of *available programs* from a computer screen. This process involves the steps 4000 shown in FIG. 4.

> FIG. 4 is a flowchart of a preferred method of user request via a user interface of the present invention. In the preferred method of FIG. 4, the user first logs onto the user terminal interface (step 4010). After the user logs on, the user may preferably select a desired item by searching the database of *available titles* in the library system control computer 1123 or any remote order processing and item database 300 (step 4020). The search may preferably be performed using the database containing the program notes, described above with respect to FIGS. 2a and 2b. It is possible to process orders and operate a database of *available titles* at multiple locations remote of the source material library 111. Users and order processing operators may preferably access such remote systems and may place transmission requests from these systems. Orders placed on these systems will be processed and distributed to the appropriate libraries. *After the desired item is found, the user selects the item for transmission at a specific time and location* (step 4030).

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

('992 patent, 14:64 – 15:22; emphasis added).

> The library access interface 121 in the reception system 200 preferably includes a title window where *a list of available titles* are alphabetically listed. This window has two modes: *local listing of material contained within the library system control computer 1123, and library listing for all available titles which may be received from the available, remotely accessible libraries*. The titles listed in this window are sent from the database on the library system control computer 1123 or the remote order processing and item database 300.
>
> The system may also preferably include dispatching control software which receives input from the remote order processing and item database 300 and sends distribution requests to the distribution systems. *In instances where not all items are contained in each of the compressed data libraries 118, the dispatching software will keep a list of the available titles in a particular compressed data library 118.* The dispatch software may also preferably coordinate network traffic, source material library 111 utilization, source material library 111 contents, and connection costs. By proper factoring of these variables, efficient use of the available distribution channels may be achieved.

('992 patent, 17:44-66; emphasis added).

Thus, the second step of claim 46 – "receiving transmission requests to transmit available items" – is definite and means "the act of receiving requests, wherein the requests seek the transmission of available items, i.e., items which have been stored as files, wherein each file comprises the compressed, formatted, and sequenced data blocks for an item."

### 29. The Order of the Steps of Claim 46 ('992 Patent, Claim 46)

| Acacia | The steps of claim 46 are not part of any specific step of claim 41. The steps of claim 46 are performed in the following order and each may be performed before, after, or simultaneously with any other step of claim 41:<br><br>    1. "generating a listing of available items";<br><br>    2. "receiving transmission requests to transmit available items"; and<br><br>    3. "retrieving stored formatted data blocks corresponding to requests from users". |
| --- | --- |
| Rounds 1 and 2 Defendants | If the Court finds that claim 46 of the '992 patent is not indefinite, the steps of claim 46 must be performed in the following order:<br><br>    1. generating a listing of available items;<br><br>    2. receiving transmission requests; and<br><br>    3. retrieving stored formatted data blocks. |

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

| Round 3<br>Defendants | If the Court finds that claim 46 of the '992 patent is not indefinite, the steps of claim 46 must be performed in the order recited in the claim, namely:<br><br>1. "generating a listing of available items";<br><br>2. "receiving transmission requests. . ."; and<br><br>3. "retrieving stored formatted data blocks. . .". |
|---|---|

Although the parties do not dispute the order in which the steps of claim 46 must be performed, the parties' do dispute when the steps of claim 46 must be performed. The steps of claim 46 are not part of any other step of claim 41. Acacia therefore contends that each step of claim 46 may be performed before, after, or simultaneously with any other step of claim 41. *See, Altiris*, 318 F.3d at 1369. Defendants do not specify when any of the steps of claim 46 are performed in relation to the steps of claim 41.

## XIII. CLAIM 47 OF THE '992 PATENT

Claim 47 of the '992 patent is an independent system claim:

> 47. A distribution system including a transmission system and a plurality of receiving systems at **[2] remote locations**, the transmission system being responsive to requests identifying items containing information to be sent from the transmission system to the receiving systems at the remote locations, the distribution system comprising:
>
> > **[30] storage means in the transmission system for storing information from the items in a compressed data form, in which the information includes an identification code and is placed into ordered data blocks**;
> >
> > **[31] requesting means in the transmission system, coupled to the storage means, for receiving requests from a user for at least a part of the stored information to be transmitted to the receiving system at one of the remote locations selected by the user;**
> >
> > **[32] transmission means in the transmission system, coupled to the requesting means, for sending at least a portion of the stored information to the receiving system at the selected remote location;**
> >
> > **[33] receiving means in the receiving system for receiving the transmitted information;**
> >
> > **[34] memory means in the receiving system, coupled to the receiving means, for storing a complete copy the received information; and**

ACACIA'S LEGAL MEMORANDUM RE DEFINITIONS
OF CLAIM TERMS FROM THE '992 AND '275 PATENTS

HENNIGAN, BENNETT & DORMAN LLP<br>
LAWYERS<br>
LOS ANGELES, CALIFORNIA

**[35] playback means in the receiving system, coupled to the memory means, for playing back the stored copy of the received information at a time requested by the user.**

30.   **"Storage Means in the Transmission System for Storing Information from the Items in a Compressed Data Form, in Which the Information Includes an Identification Code and is Placed Into Ordered Data Blocks" ('992 Patent, Claim 47)**

| Acacia | The term "storage" is sufficient structure to perform the claimed function and therefore overcome the presumption of 35 U.S.C. § 112, ¶ 6.<br><br>If construed pursuant to 35 U.S.C. § 112, ¶ 6 -- a compressed data library (118) and all equivalents. |
|--------|-------------|
| Rounds 1 and 2 Defendants | This element is governed by § 112, ¶ 6, and is indefinite. |
| Round 3 Defendants | This is a means-plus-function limitation to be construed pursuant to 35 U.S.C. § 112 ¶ 6, and is indefinite. |

Claim 47 of the '992 patent includes the phrase "storage means in the transmission system for storing information from the items in a compressed data form, in which the information includes an identification code and is placed into ordered data blocks"  This phrase uses the term "means for," and therefore is presumptively construed pursuant to 35 U.S.C. § 112, ¶ 6.  In this case, however, the claim phrase recites the structure ("storage")[10] for performing the recited function ("storing information in a compressed data form").  Therefore, the presumption that 35 U.S.C. § 112, ¶ 6 controls is overcome.  *See, TI Group Auto. Sys. (N. Am.), Inc. v. VDO N. Am., L.L.C.*, 375 F.3d 1126, 1135 (Fed. Cir. 2004) ("While the use of the word 'means' gives rise to a presumption that § 112, paragraph 6 applies, the presumption is overcome by the recitation of the structure needed to perform the recited function.")  This phrase should therefore be construed to mean "a storage device."

---

[10] The term "storage" is defined in the *IEEE Standard Dictionary of Electrical and Electronics Terms*, Sixth Edition (1996) as "a storage device" or "any medium in which data can be retained." (See Block Declaration, Exhibit 4.)

HENNIGAN, BENNETT & DORMAN LLP

LAWYERS

LOS ANGELES, CALIFORNIA

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

The Court may find, however, that the term "storage" is not sufficient structure to overcome the presumption that 35 U.S.C. § 112, ¶ 6 applies. If this is the case, then the Court would follow the construction rules for terms construed pursuant to 35 U.S.C. § 112, ¶ 6. Construction of means-plus-function phrases "requires the court to first identify the function of the means-plus-function limitation and next identify the corresponding structure in the written description necessary to perform that function." *BBA Nonwovens Simpsonville, Inc. v. Superior Nonwovens, LLC*, 303 F.3d 1332, 1343-1344 (Fed. Cir. 2002), *citing*, *Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999).

Here, the claimed function is "storing information from the items in a compressed data form, in which the information includes an identification code and is placed into ordered data blocks." The corresponding structure described in the specification necessary to perform this function is a compressed data library (118). (*See*, '992 patent, 10:17-45; 12:48-57; 13:9-47; 19:11-20; Fig. 2a, reference no. 118, and Fig. 5, reference no. 5040).

> In accordance with a preferred embodiment of the present invention, the transmission system 100 may further comprise compressed data storing means, coupled to the compression means, for *storing as a file the compressed sequenced data with the unique identification code received from the data compression means*. After compression processing by compressor 116, the compressed audio and video data is preferably formatted and placed into a single file by the compressed data storage means 117. The file may contain the compressed audio and/or video data, time markers, and the program notes. The file is addressable through the unique identification code assigned to the data by the identification encoder 112.

> Further, according to the present invention, the transmission system preferably includes compressed data library means for separately storing composite formatted data blocks for each of the files. The compressed data storage means preferably includes compressed data library 118, as shown in FIG. 2b. *After the data is processed into a file by the compressed data storage means 117, it is preferably stored in a compressed data library 118.* In a preferred embodiment, compressed data library 118 is a network of mass storage devices connected together via a high speed network. Access to any of the files stored in compressed data library 118 is available from multiple reception systems 200 connected to the transmission and receiving system.

('992 patent, 10:17-45).

> Processing step 413 also includes compressing the formatted and sequenced data performed by data compressor 116 (step 413d), and storing as a file the compressed sequenced data received from the data

1  compression means with the unique identification assigned by the
   identification encoding means (step 413e).

2

3  After the information is processed for efficient transfer, in substeps 413a-e
   of step 413, the distribution method 400 of the present invention preferably
   includes the step of storing the processed information is stored in a
4  compressed data library (step 414). Preferably, the compressed data
   library is analogous to compressed data library 118, described with
5  respect to FIG. 2a.

6  ('992 patent, 19:11-17).

7  The specification further describes the compressed data library. It may be a mass storage

8  device or a network of mass storage devices connected together via a high speed network and all

9  equivalents. The compressed data library may also be comprised of Winchester drives, magneto-

10 optical disks, or cassette tapes and all equivalents.

11



*FIG. 2b*

26 The Round 3 Defendants contend that this claim phrase and nearly every other claim phrase

27 in the '992 patent using the phrase "means for" is indefinite. The Rounds 1 and 2 Defendants

28

contend that this claim phrase and *every* other claim phrase in the '992 patent using the phrase "means for" is indefinite. As demonstrated above for this claim phrase, and below for every other claim phrase using the words "means for" in the '992 patent, there is sufficient structure disclosed in the specification for performing the claimed functions.

To find any means-plus-function claim phrase indefinite requires the Court to find that the specification does not recite sufficient structure to perform the claimed function. "Whether the specification adequately sets forth structure corresponding to the claimed functions must be considered from the perspective of one skilled in the art." *Intel Corp. v. VIA Techs.*, 319 F.3d 1357, 1365-1366 (Fed. Cir. 2003), *citing, Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369, 1376 (Fed. Cir. 2001) (in both cases, finding sufficient structure); *Creo Prods. v. Presstek, Inc.*, 305 F.3d 1337, 1347 (Fed. Cir. 2002) (finding sufficient structure: "Under our case law interpreting § 112, ¶ 6, knowledge of one skilled in the art can be called upon to flesh out a particular structural reference in the specification for the purpose of satisfying the statutory requirement of definiteness."); *S3 Inc. v. nVIDIA*, 259 F.3d 1364, 1370 (Fed. Cir. 2001) (finding sufficient structure and holding that the specification's reference to a "selector" sufficed as one skilled in the art would have understood the term); *Atmel Corp. v. Info. Storage Devices, Inc.*, 198 F.3d 1374, 1378-79 (Fed. Cir. 1999) (holding that the determination of whether sufficient structure is disclosed in the specification to support a means-plus-function limitation is based on the understanding of one skilled in the art).

Further, "any fact critical to a holding on indefiniteness, moreover, must be proven by the challenger by clear and convincing evidence." *Intel*, 319 F.3d 1365-1366, *citing, Budde*, 250 F.3d at 1376-1377. Thus, to prove indefiniteness, the defendants must prove, by clear and convincing evidence, that the specification lacks adequate disclosure of structure to be understood by one skilled in the art as able to perform the recited functions.

Defendants will be unable to make this showing on this or any of the means-plus-function claim terms in the claims of the '992 patent at issue in this Markman brief. However, if the Court is inclined, following the Markman hearing, to find that any means-plus-function claim term is indefinite, then Acacia respectfully requests that the Court reserve judgment until after Acacia is given the opportunity to present expert testimony at an evidentiary hearing to demonstrate to the

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA